OPINION
{¶ 1} Defendant-appellant, Michael A. Gover ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas convicting him of one count of aggravated murder with a repeat violent offender specification, in violation of R.C.2903.01, and one count of tampering with evidence, in violation of R.C. 2921.12.
 {¶ 2} The charges in this case arose out of the stabbing death of Jason Schmalenberger ("Schmalenberger") that occurred on April 3, 2005, near the intersection of State Route 317 and Parsons Avenue in Franklin County, Ohio. The autopsy revealed approximately six stab wounds to Schmalenberger, two to the front of his chest, one to his left, front thigh, one to his right foot, one to his left buttock, and one to his left, back thigh. The chain of events leading up this incident were adduced at trial, and are summarized in the following paragraphs.
 {¶ 3} On April 2, 2005, Amber Weakley, Jerry Weakley's ("Weakley") sister, had a party at Weakley's residence. Among the guests at the party were appellant, Charles Dickerson ("Dickerson"), Sirquan Allen ("Allen"), Melvin Taylor ("Taylor"), and appellant's girlfriend Amanda Fisher ("Fisher"). After the party, the named individuals spent the night at Weakley's. The next day, Weakley decided to give all of them a ride home in his girlfriend's car, a blue Topaz. Weakley, accompanied by appellant, Fisher, Dickerson, Allen, and Taylor, stopped at a convenient store, and then proceeded to Fisher's house near Parsons Avenue. Fisher got out of the car and Weakley and the remaining passengers drove away. However, they returned to Fisher's house twice because of items she had left in the car. When leaving Fisher's house for the final time, Weakley was driving, Allen was in the front passenger's seat, appellant, Taylor, and Dickerson were all in the back seat, appellant being seated behind Weakley.
 {¶ 4} Weakley was traveling on a residential street with cars parked on both sides, when he came in contact with a van traveling in the opposite direction that had "Co-Vad" written on its side. According to the testimony of the car's occupants, the van swerved in their direction, causing Weakley to swerve to avoid a collision. Weakley described that everyone in the car got a little agitated, and some occupants started yelling. One of the occupants stated that the van's driver "should get his ass kicked." (Tr. at 216.) Appellant told Weakley to "turn around," and said things like, "let's go get him." Id. According to Dickerson, though the conversation in the car was "what the hell happened?" and "go follow them," appellant was the loudest of the group and "pretty insistent" about turning around to follow the van. (Tr. at 392.) In response to the van's alleged swerving, appellant said, "Fuck that. Don't nobody play me. Turn around." (Tr. at 391.) Appellant also stated, "I'm going to get that mother fucker." (Tr. at 488.) Though Weakley hesitated about turning around, according to Dickerson, appellant kept insisting, and after about thirty seconds, Weakley complied.
 {¶ 5} There were two, possibly three cars in front of Weakley as he caught up to the van. At an intersection, the cars turned off leaving the Topaz directly behind the van. Weakley sped up and proceeded to pass the van on Parsons Avenue. At the next stop sign, Weakley stopped, and everyone, except for Weakley, exited the car. Appellant went to the van's driver's side, and appeared to start fighting with the driver, Schmalenberger, while another man held the passenger side door shut. The men thought that it was a fistfight, but at some point, it was discovered that Schmalenberger had been stabbed a number of times with a knife. According to Franklin County Deputy Coroner, Dr. Collie Trent, Schmalenberger died as a result of two stab wounds that penetrated his heart and the area around it. During the altercation, Schmalenberger's cousin, Rick Rice ("Rice"), who was the passenger in the van called 911.
 {¶ 6} Immediately after the fight, the four individuals ran back to the Topaz, and they fled. During this time, according to Weakley, appellant stated, "I'm a killer, I'm a killer." (Tr. at 223.) As a police car pulled up behind the Topaz and activated its siren, Weakley pulled off into a parking lot, whereupon appellant attempted to give the knife to Dickerson, who refused to take it. Thereafter, appellant opened the car door and dropped the knife into the parking lot. The police then approached the Topaz with guns drawn and all the occupants were taken into custody. A search of the area resulted in finding a bloody knife in the parking lot. Excluding appellant, all of the car's occupants testified at trial that appellant was the only one involved in the physical altercation with Schmalenberger, and that appellant had a bloody knife in his possession after the confrontation.
 {¶ 7} According to Rice, he and Schmalenberger were on their way to play golf on the afternoon of April 3, 2005, when they were passed by a blue Topaz driving very fast. At the stop sign, the occupants of the Topaz got out and began running towards the van. Rice tried to get out, but one man held the door shut. Appellant pulled Schmalenberger's door open and Rice saw Schmalenberger getting punched and trying to push appellant away. Rice heard appellant say, "Give me my knife" three times. (Tr. at 794.) At this point, Rice did not know that Schmalenberger was getting stabbed. Rice was calling 911 as Schmalenberger was asking for help. Rice tried to jab appellant with an "ink-pen-looking device" that was in the van's console, but to no avail. As he stayed on the line with 911, the four men ran back to the Topaz, and Rice told Schmalenberger to follow them. Schmalenberger did so for a few hundred yards, but then Schmalenberger looked at Rice and said, "I am not doing so good." (Tr. at 795.) Schmalenberger fell over as the van coasted into the guardrail, and at this time, Rice realized that Schmalenberger had been stabbed. Rice held Schmalenberger until the ambulance arrived.
 {¶ 8} On April 12, 2005, appellant was indicted by a Franklin County Grand Jury on one count of aggravated murder, with prior calculation and design, one count of murder, during the course of a felony, and one count of tampering with evidence, to wit: a knife. The aggravated murder and murder charges carried repeat violent offender ("RVO") specifications alleging that appellant had a prior conviction for voluntary manslaughter. The case proceeded to jury trial. Appellee requested, and received, a nolle prosequi on the murder charge. The jury found appellant guilty as charged of aggravated murder and tampering with evidence. Pursuant to appellant's jury waiver regarding the RVO specification, the matter was tried to the court, and the trial judge found appellant guilty of the RVO specification. The trial court sentenced appellant to life without parole on the aggravated murder charge, consecutive to a ten-year term on the RVO specification, and consecutive to a five-year term on the tampering with evidence charge. Appellant timely appealed.
 {¶ 9} On appeal, appellant brings the following two assignments of error for our review:
First Assignment of Error
THE COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR ACQUITTAL PURSUANT TO CIV.R. 29(B).
Second Assignment of Error
THE COURT ERRED IN REFUSING TO GIVE A REQUESTED JURY INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER.
 {¶ 10} Under his first assignment of error, appellant contends that the trial court erred in overruling his motion for acquittal pursuant to Crim.R. 29 because, appellant asserts, appellee failed to prove the element of prior calculation and design. Crim.R. 29 provides that:
The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.
 {¶ 11} A trial court may not enter a judgment of acquittal where reasonable minds could differ on whether each material element of a crime has been proven beyond a reasonable doubt.State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus. When presented with a challenge to the sufficiency of the evidence, the Supreme Court of Ohio has delineated the role of an appellate court as follows:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781,61 L.Ed.2d 560, followed.)
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 12} The thrust of appellant's argument is that based on appellee's evidence, no reasonable juror could have found that appellant acted with prior calculation and design in the death of Schmalenberger. Appellant asserts that the evidence indicates that the occupants of the Topaz were upset because Schmalenberger's van nearly involved them in an accident that could have resulted in serious harm, and though Weakley was encouraged to turn around and go after the van, none of the occupants of the car believed that anything other than a fist fight would occur. Further, because witnesses to the fight indicated appellant delivered several blows to Schmalenberger, with only six resulting in knife wounds, appellant contends there is no clear evidence as to when appellant began using the knife; therefore, there was not sufficient evidence to go to the jury on the element of prior calculation and design.
 {¶ 13} In defining the offense of aggravated murder, R.C.2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" Though not defined by the Revised Code, prior calculation and design has been interpreted by the Supreme Court of Ohio to require evidence of "more than [a] few moments of deliberation" and "a scheme designed to implement the calculated decision to kill." State v. Conway, 108 Ohio St.3d 214, 220, 2006-Ohio-791, quoting State v. Cotton (1978), 56 Ohio St.2d 8, 11. "* * * [W]here the evidence presented at trial `reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.'" Id., quotingCotton, paragraph three of the syllabus. There is no bright line test to determine whether prior calculation and design are present, rather each case must be decided on a case-by-case basis. State v. Taylor (1997), 78 Ohio St.3d 15. "* * * [P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes."State v. Coley (2001), 93 Ohio St.3d 253, 264.
 {¶ 14} Testifying during appellee's case-in-chief were Dr. Trent, Weakley, Dickerson, Allen, Taylor, Rice, Franklin County Sheriff's Deputy Michael Lord, the first officer to arrive at the scene, Groveport Police Officer Kurtis Blevins, and Special Agent Gary Wilgus with the Ohio Bureau of Criminal Identification and Investigation. Some evidence was presented suggesting that Weakley swerved in response to a van swerving in his direction. However, Rice testified that he did not recall any swerving or any incidents on the roadway that day, and that his first recollection of the Topaz was when it passed the van on Parsons Avenue.
 {¶ 15} Weakley testified that after the van swerved in his direction, he hesitated for about thirty seconds before complying with his passengers' request to turn around and follow the van. After turning around, Weakley described that they followed the van for two to five minutes on Parsons Avenue prior to reaching the stop sign. According to Taylor, they followed the van for about five minutes before stopping at the stop sign. Rice described that he and Schmalenberger traveled for about thirty-five seconds after the van passed them before stopping behind the Topaz at the stop sign. We find that these time frames are sufficient for appellant to have decided to kill, and to formulate his plan to carry it out. See Conway, supra. InConway, the defendant, Conway, and others were leaving a strip club when Conway's brother was stabbed. It was alleged that after the stabbing Conway went to the trunk of a car, retrieved a gun, began moving through the parking lot to the person he believed stabbed his brother, and began shooting. The Supreme Court of Ohio found that this was sufficient time for the defendant to have formulated a plan to kill. According to the testimony, one and a half to two and a half minutes elapsed between the time Conway's brother was stabbed and the first shots were fired. In response to Conway's actions, the court stated, "[a]lthough they took only a few minutes, Conway's actions went beyond a momentary impulse and show that he was determined to complete a specific course of action." Id. at 22.
 {¶ 16} In the instant case, the evidence establishes that, at the very least, three minutes passed from when the van swerved at Weakley to when appellant and his friends overtook the van. Additionally, there was testimony that appellant was the loudest and the most insistent about turning around to "get" the van's driver. Appellant was also making remarks such as, "Fuck that. Don't nobody play me. Turn around," (Tr. at. 391) and "I'm going to get that mother-fucker." (Tr. at 488.) When they stopped, appellant said, "come on, get out, fuck this. Let's get this mother fucker." Appellant was the first one out of the Topaz and he ran directly to the driver's side of the van armed with a knife. According to the occupants of the Topaz, appellant got out of the car while it was slowing down and before it was even completely stopped.
 {¶ 17} Dickerson described that at first he thought appellant and Schmalenberger were just punching each other, but after five or ten seconds, as he walked toward appellant Dickerson saw blood on Schmalenberger's socks and saw that appellant had a knife in the opened and locked position. After returning to the Topaz, Dickerson testified that appellant said, "Fuck that. Nobody play me. I'm a killer. Nobody play me. You all better get his ass to a hospital fast." (Tr. at 407.)
 {¶ 18} Allen described that as Weakley was pulling up to the stop sign, appellant jumped out of the car and ran back to the van. When Allen reached the van, he saw appellant stabbing Schmalenberger and the blood. Allen told his friends, "Let's go," and headed back to the Topaz. (Tr. at 593.) Appellant was the last to get back to the Topaz and as Weakley drove off, appellant was saying, "I want out. I told you all I'm a killer. I'm a killer, I'm a killer." (Tr. at 595.)
 {¶ 19} Taylor testified that after the swerving incident, appellant kept saying things like "damn mother-fucker," and kept insisting that they go back and follow the van. (Tr. at 712.) Taylor described that when they reached the stop sign, appellant got out and went to the van. Taylor also thought they were just punching each other, but when he exited the Topaz to get a better look, he saw that appellant was stabbing Schmalenberger.
 {¶ 20} Rice described that during the altercation he heard appellant say, "give me my knife," three times. (Tr. at 794.) This corroborates the testimony of Taylor who described that partway through the attack, appellant dropped his knife, and asked one of the others to get it for him. This evidence suggests that the stabbing took place in the first instances of the attack. Further, the medical examiner's testimony supports the view that the fatal chest wounds were inflicted first because Schmalenberger would have been in a seated position for appellant to deliver such blows to his chest. After those initial blows, Schmalenberger began resisting, kicking, and twisting, which explains the wounds to the buttocks, legs and foot.
 {¶ 21} Construing the evidence in a light most favorable to the prosecution, a rational juror could have concluded beyond a reasonable doubt that appellant acted with prior calculation and design. To recapitulate, the evidence before the trial court suggests that after the swerving incident, appellant insisted that Weakley turn around to follow the van because "nobody plays" him and he wanted to "get the mother-fucker." (Tr. at 488.) Appellant told Weakley to pass the van, then at the next stop sign, appellant jumped out of the car first, went to the driver's side of the van, and began stabbing Schmalenberger. These facts are sufficient to prove that appellant adopted a plan to kill. Therefore, the trial court properly denied appellant's Crim.R. 29 motion for acquittal with respect to the aggravated murder charge. Accordingly, appellant's first assignment of error is overruled.
 {¶ 22} In his second assignment of error, appellant contends that the trial court erred in refusing to give a requested jury instruction on the offense of voluntary manslaughter. When reviewing a trial court's jury instruction, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction was an abuse of discretion under the facts and circumstances of the case. Statev. Wolons (1989), 44 Ohio St.3d 64, 68; State v.Dovangpraseth, Franklin App. No. 05AP-88, 2006-Ohio-1533; Statev. Phipps, Mahoning App. No. 04 MA 52, 2006-Ohio-3578. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 23} R.C. 2903.03(A) defines voluntary manslaughter, and provides, "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another[.]" Voluntary manslaughter is an inferior degree of aggravated murder. Statev. Tyler (1990), 50 Ohio St.3d 24, 36.
 {¶ 24} Even though voluntary manslaughter is not a lesser-included offense of murder, the test for whether a trial court should give a jury an instruction on voluntary manslaughter, when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser-included offense is sought. State v. Shane (1992), 63 Ohio St.3d 630,632. Thus, a defendant charged with aggravated murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of aggravated murder and a conviction of voluntary manslaughter. Conway, supra at 238, citing Shane at 632. "Before giving a voluntary-manslaughter instruction in a murder case, the trial court must determine `whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction.'" Id. at 238-239, quoting Shane, paragraph one of the syllabus. "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Shane, at 635.
 {¶ 25} In the case at bar, there is no evidence whatsoever that this was a fight that escalated into a stabbing, or that there was provocation occasioned by the victim. In fact, the evidence suggests the contrary. Weakley testified that Schmalenberger's van swerved in the direction of the Topaz. On cross-examination, Weakley stated that the swerving incident was "not a big deal." (Tr. at 280.) While Allen testified that on that day he thought the van's driver swerved purposefully, the others testified that they did not know if the van swerved on purpose or not. Rice testified that he did not recall any swerving at all that day prior to the stabbing. In fact, according to Rice, even when the Topaz sped passed them on Parsons Avenue, he and Schmalenberger did not realize anything was wrong. When the Topaz stopped and its occupants all got out, Rice testified that Schmalenberger said, "Chinese fire drill," which to Rice was a joke, meaning "when you're kids, you run around the car and change sides, change drivers, whatever." (Tr. at 821.)
 {¶ 26} It would appear from the testimony that if Schmalenberger swerved in the direction of the Topaz, it was an unintentional, possibly negligent act. To hold that Schmalenberger's alleged actions in this case rise to the level of serious provocation that was reasonably sufficient to incite appellant into using deadly force in order for him to be convicted of voluntary manslaughter rather than aggravated murder borders on ridiculous. We cannot, in good conscious, hold that this apparent case of "road rage," stemming from Schmalenberger's actions that had only the potential to have resulted in a traffic accident, supports a jury instruction on voluntary manslaughter.
 {¶ 27} Even if Schmalenberger, for some reason,purposefully swerved in the direction of the Topaz, we would still be unable to find sufficient provocation for appellant's use of deadly force in this case. There was no resulting accident, no injury to appellant or any other passengers in the car, nor was there any property damage to the Topaz. There were not even any hand gestures or words exchanged between the parties in the vehicles at the time of the alleged swerving, or when the Topaz passed the van. Further, the evidence indicates a time lapse of at least thirty seconds of hesitation on the driver's part to turn and follow the van, followed by two and a half to five minutes of following the van before appellant instructed Weakley to pass it, and another thirty-five seconds before the Topaz stopped at the stop sign. Then, as Weakley began slowing down to stop at the stop sign, appellant ran from the car, armed with a knife, and began stabbing the van's driver while he was seated in the van.
 {¶ 28} "Even assuming that [a]ppellant subjectively could be easily provoked to act under the influence of a sudden passion or in a sudden fit of rage, there still must be serious provocationoccasioned by the victim." State v. Braden,98 Ohio St. 3d 354, 366, 2003-Ohio-1325 (Emphasis sic). We find no evidence that the victim, Schmalenberger did anything towards appellant that was reasonably sufficient to incite or arouse appellant into using deadly force. See State v. Yates, Cuyahoga App. No. 86631, 2006-Ohio-3004 (finding that the defendant was not entitled to a voluntary manslaughter instruction where the shooting victim was the initial aggressor by initially cutting off the defendant's car, then exiting his vehicle and arguing with the defendant). Therefore, we find that the trial court did not err in refusing to give the requested jury instruction on voluntary manslaughter. Accordingly, appellant's second assignment of error is overruled.
 {¶ 29} For the foregoing reasons, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Klatt, P.J., and Travis, J., concur.