OPINION
{¶ 1} Defendant-appellant, D'Marcell Rahe, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of murder with a firearm specification. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On June 16, 2005, defendant was indicted on one count of murder, with specifications, in connection with the June 7, 2005 shooting death of Robert Williams. Defendant pled not guilty as charged in the indictment, and a jury trial began in August 2006. *Page 2 
 {¶ 3} At trial, the state's evidence indicated as follows. In June 2005, Mr. Williams lived with his mother, Betty Williams, on Mayfair Boulevard in Franklin County. On the morning of June 7, 2005, Mr. Williams received a telephone call at the residence from defendant. Mr. Williams told his mother that he had to go, and she saw him get into defendant's car outside her house.
 {¶ 4} At 1:12 pm, on the same day, the Columbus police received a 911 call from defendant. A recording of the call was played to the jury. The recording revealed that defendant informed the 911 operator that he needed emergency personnel at his apartment because he had shot his boyfriend after his boyfriend had "tried to do something to [him]" and "had tried to beat [him] up." (Tr. 74-75.)
 {¶ 5} When Columbus Police Officer Christopher Odom arrived at the scene of the shooting, defendant was standing outside the apartment, holding a cordless telephone. Defendant, in a calm but nervous demeanor, identified himself as the 911 caller who reported the shooting. Knowing that the caller had identified himself as the shooter, Officer Odom checked defendant for weapons and placed him in the police cruiser. Columbus Police Officer Daniel Dixon also arrived at the scene.
 {¶ 6} The officers went into the apartment to locate the shooting victim, and they found Mr. Williams unconscious and facedown on the floor with a bullet hole in his stomach region. He appeared to be deceased. Emergency medical personnel were summoned to the scene. Once the medical personnel arrived, Officer Odom returned to his cruiser in which defendant had been placed.
 {¶ 7} Defendant was very talkative and told Officer Odom that he was emotionally hurt because he had cooked dinner the previous evening for the victim and the victim did *Page 3 
not show up. Defendant also indicated to Officer Odom that the victim was "throwing him around" and had accused defendant of cheating on him. (Tr. 101.) Defendant did not complain about any injuries and Officer Odom did not observe any injuries on defendant.
 {¶ 8} The police recovered a firearm on the bed in defendant's apartment, which is where defendant told the 911 operator it would be found. Two bullet shell casings were also found in the apartment. A gunshot-residue test was performed on samples collected from defendant's left and right hands. The sample taken from defendant's right hand was positive for particles highly indicative of gunshot residue, and the sample taken from his left hand was negative for said particles. A bullet hole was discovered in the floor of defendant's apartment, and a lead projectile was recovered in the apartment located below defendant's apartment. A second lead projectile was recovered from Mr. Williams' body at the autopsy. The parties stipulated to the fact that Mr. Williams died from a gunshot wound to his abdomen.
 {¶ 9} Columbus Police Detective Amy Morris interviewed defendant at Columbus police headquarters on the day of the shooting. Defendant did not complain of any injuries to Detective Morris, and the detective did not observe any injuries. Defendant made various statements to Detective Morris regarding his relationship with Mr. Williams and the events of that day. He said that he and Mr. Williams had made arrangements to see each other that day, and that, around 11 am that morning, he picked up Mr. Williams. He indicated that, in the car ride to defendant's apartment, Mr. Williams accused defendant of cheating on him. He told the detective that, after the two entered the apartment, they talked on the couch, and then Mr. Williams choked him. He stated that he thought he was going to die, but he was able to get away from Mr. Williams and to *Page 4 
retrieve a gun in his bedroom. He claimed that he fired the gun in an attempt to scare Mr. Williams, and he informed the detective that he fired the weapon two times. When Detective Morris told defendant that Mr. Williams had died, defendant put his head down and into his hands.
 {¶ 10} Defendant testified on his own behalf, and his testimony indicated as follows. Mr. Williams and defendant began dating approximately a year before the shooting and, in December 2004, decided to "become a couple." (Tr. 271.) According to defendant, Mr. Williams had pushed or choked him about four times during their relationship. The two decided to break up in March 2005. In late May, Mr. Williams attempted to contact defendant. The two eventually spoke to each other, and Mr. Williams indicated that he had left clothing at defendant's apartment and wanted to talk with defendant. Defendant agreed to pick up Mr. Williams and did so on June 7, 2005. When defendant picked up Mr. Williams, he remained outside the residence. Mr. Williams got into the car, and initially it was quiet. Then Mr. Williams was loud and upset because defendant was not excited to see him. Mr. Williams also accused defendant of cheating on him. Defendant described Mr. Williams' body language as "aggressive." (Tr. 289.)
 {¶ 11} The two arrived at defendant's apartment at approximately 11:20 am. Once in the apartment, Mr. Williams began to question defendant about graduation cards with male signatures on them. Mr. Williams was persistent regarding the names on the cards and grabbed defendant and asked him about the names. Mr. Williams continued to make accusations to defendant. *Page 5 
 {¶ 12} Eventually, the two sat on the couch to talk, and Mr. Williams put his arm around defendant, which defendant viewed as appropriate. However, at some point, Mr. Williams used his arm to put defendant into a headlock. At first, defendant experienced no pain because of the headlock. Then, the headlock got tighter and defendant attempted to get out of it. Defendant was able to temporarily get out of the headlock, but Mr. Williams placed him in another headlock. Defendant testified that he "felt like [he] was going to die or something bad was going to happen to [him] that day." (Tr. 305.) Defendant had difficulty breathing when he was placed in the second headlock. Mr. Williams pushed defendant to the floor, and defendant hit his head against the wall, which gave him a bad headache.
 {¶ 13} Defense counsel asked defendant what emotions he felt when he had been knocked to the floor, and defendant responded, "fear * * * fear for my life, yes." (Tr. 310.) Defense counsel asked, "Was there any anger?" Id. Defendant responded, "I was scared." Id. Defendant testified that he was "real scared and petrified," was crying, and was "trying to get away, get out." Id. Upon further questioning by defense counsel regarding defendant's emotions at the time he was on the floor, defendant testified that he felt a mixture of anger, frustration, and fear in response to Mr. Williams' actions. Defendant further testified as follows: "It was just so many emotions, all snowballed into one. I never felt like that before. And it just wore me out. I didn't know how to respond to it." (Tr. 310-311.)
 {¶ 14} After being pushed to the floor, defendant went into his bedroom and retrieved a gun, "thinking that * * * that would stop him, but it just made him charge even more." (Tr. 312.) Defendant "let him know that [he] had a gun, to try to scare him off." *Page 6 
(Tr. 317.) Defendant fired a shot, "[t]hinking that maybe if he heard the noise of the gun that it would just stop him. And it [didn't]." (Tr. 318.) Defendant further testified: "When I was aiming the gun, the first time, that was to — it was like a warning so he can hear the noise and get back." (Tr. 349.) Defendant did not believe that the bullet from the first firing struck Mr. Williams. Defendant fired the second shot in an attempt to stop Mr. Williams. After shooting the second bullet, defendant saw that Mr. Williams had been struck, and then went into the bedroom and dropped the gun on the bed. He immediately called 911 and stood outside the apartment to wait for help. Defendant testified that he acted in self-defense.
 {¶ 15} At the conclusion of the trial, the trial court gave its instructions to the jury, which included an instruction on self-defense. Over defense counsel's objection, the trial court did not give an instruction on voluntary manslaughter. The jury found defendant guilty of murder with a firearm specification. The trial court sentenced defendant to a prison term of 15 years to life for the murder count, and an additional three consecutive years for the firearm specification, for a total of 18 years to life in prison. Defendant appeals from his conviction and sets forth the following single assignment of error for our review:
 THE DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO GIVE AN INSTRUCTION AS TO THE OFFENSE OF VOLUNTARY MANSLAUGHTER CONTRA THE OHIO AND FEDERAL CONSTITUTIONS.
 {¶ 16} According to defendant, he was entitled to a voluntary manslaughter jury instruction, and, therefore, the trial court erred in denying his request for the instruction. In a recent case involving a trial court's refusal to give a requested jury instruction on *Page 7 
voluntary manslaughter, this court observed: "When reviewing a trial court's jury instruction, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction was an abuse of discretion under the facts and circumstances of the case." State v. Gover, Franklin App. No. 05AP-1034,2006-Ohio-4338, at ¶ 22, citing State v. Wolons (1989),44 Ohio St.3d 64, 68; State v. Dovangpraseth, Franklin App. No. 05AP-88,2006-Ohio-1533; State v. Phipps, Mahoning App. No. 04 MA 52,2006-Ohio-3578. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 17} It has also been stated that "[t]he court must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." State v. Joy (1995),74 Ohio St.3d 178, 181, citing State v. Comen (1990), 50 Ohio St.3d 206, paragraph two of the syllabus. Conversely, "[i]t is well established that the trial court will not instruct the jury where there is no evidence to support an issue." Murphy v. Carrollton Mfg. Co. (1991),61 Ohio St.3d 585, 591, citing Riley v. Cincinnati (1976),46 Ohio St.2d 287. Therefore, "`[i]n reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.'" Murphy, at 591, quoting Feterle v. Huettner (1971),28 Ohio St.2d 54, syllabus.
 {¶ 18} Ohio's voluntary manslaughter statute, R.C. 2903.03, provides that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably *Page 8 
sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy." Voluntary manslaughter is an inferior degree of murder, as "`"its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements."'" State v. Shane
(1992), 63 Ohio St.3d 630, 632, citing State v. Tyler (1990),50 Ohio St.3d 24, 36, quoting State v. Deem (1988), 40 Ohio St.3d 205, 209. "Our criminal law recognizes that the provoked defendant is less worthy of blame than the unprovoked defendant, but the law is unwilling to allow the provoked defendant to totally escape punishment," in contrast to a situation involving a killing in self-defense. Id. at 635.
 {¶ 19} Even though voluntary manslaughter is not a lesser-included offense of murder, the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser-included offense is sought. Id. Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter. Id.
 {¶ 20} "Before giving a jury instruction on voluntary manslaughter in a murder case, the trial judge must determine whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." Shane, at paragraph one of the syllabus. "The trial judge is required to decide this issue as a matter of law, in view of the specific facts of the individual case. The trial judge should evaluate the evidence in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." Id. at 637, citing State v. Wilkins (1980), *Page 9 64 Ohio St.2d 382, 388. "An inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components." Shane, at 634.
 {¶ 21} When determining whether provocation was reasonably sufficient to induce sudden passion or sudden fit of rage, an objective standard must be applied. Id. "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id. at 635. Thus, the court must furnish "the standard of what constitutes adequate provocation, i.e., that provocation which would cause a reasonable person to act out of passion rather than reason." (Citations omitted.) Id. at 634, fn. 2. "If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction." Shane, at 364. The subjective component of the analysis requires an assessment of "whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." Id. "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." State v. Mack (1998), 82 Ohio St.3d 198, 201.
 {¶ 22} In this appeal, defendant contends that State v. Davis, Hamilton App. No. C-040665, 2006-Ohio-3171, supports his position that he was entitled to an instruction on voluntary manslaughter. InDavis, the defendant appealed from his conviction for voluntary manslaughter and argued that the trial court erred when it instructed the jury on the unindicted offense of voluntary manslaughter. InDavis, there was testimony of a "heated argument" before the victim was shot, and that the victim had hit the defendant "over the head with his gun with enough force to break the gun." Id. at ¶ 11. The Davis *Page 10 
court determined that "the state had presented sufficient evidence to sustain a conviction for voluntary manslaughter," and, therefore, the trial court properly instructed the jury on the offense. See id. at ¶ 10-12.
 {¶ 23} The Davis court appears to have proceeded in its analysis under the erroneous assumption that the state had the burden of establishing sudden passion or a sudden fit of rage as to the voluntary manslaughter conviction. However, "[s]udden passion or a sudden fit of rage occasioned by the victim * * * are circumstances that mitigate culpability, and they are not elements of the crime of voluntary manslaughter." State v. Thomas, 170 Ohio App.3d 727, 2007-Ohio-1344, at ¶ 28, citing State v. Muscatello (1978), 55 Ohio St.2d 201. Therefore, we find the reasoning applied in Davis to be flawed and, thus, defendant's reliance upon that case is unpersuasive.
 {¶ 24} Defendant argues that the provocation occasioned by the victim in this case was reasonably sufficient to incite a person to use deadly force. At trial, defendant testified that he thought he was going to die when Mr. Williams, who had been his boyfriend, placed him in a headlock and restricted his ability to breathe. Even assuming arguendo that Mr. Williams' actions constituted serious provocation, there was insufficient evidence to support a finding that defendant shot him while actually under the sudden influence of passion or in a sudden fit of rage.
 {¶ 25} Defendant testified at trial that he experienced many emotions, including fear, frustration, and anger, as a result of Mr. Williams' actions. According to defendant, his testimony regarding his anger distinguishes this case from other cases involving the rejection of a defendant's contention that a voluntary manslaughter instruction was required because those cases only involved evidence of fear in connection with the *Page 11 
homicide. For example, defendant cites State v. Copley, Franklin App. No. 04AP-511, 2005-Ohio-896, as a case where the defendant testified that he was scared when he shot the victim. In Copley, the defendant argued that the trial court committed plain error when it did not instruct the jury on voluntary manslaughter. In that case, the defendant testified that he was scared when he shot the victim, and also claimed that he did not act out of rage, testifying "I didn't have time to be like, oh, God, why did she do this?" and "I didn't have time to reflect anger." Id. at ¶ 39. This court resolved that the defendant did not shoot the victim while under the sudden influence of passion or in a sudden fit of rage, and, thus, the evidence did not warrant a voluntary manslaughter jury instruction. Id. at ¶ 40. Defendant argues that the reasoning applied in Copley applies here because he testified that, in addition to being scared, he was angry and frustrated.
 {¶ 26} Although defendant's testimony indicated that he experienced a mixture of emotions, including fear, frustration, and anger, as a result of Mr. Williams' actions, there is no indication that defendant acted out of anger when he shot Mr. Williams. Rather, he specifically testified that, after he escaped the headlock, he retrieved the firearm in the bedroom and fired it in self-defense. In fact, defendant's own direct testimony regarding his reasoning process of first deciding to attempt to stop Mr. Williams by firing a warning shot, and then deciding to shoot him to stop him, is inconsistent with an assertion that he acted under the influence of sudden passion or in a sudden fit of rage when he fatally shot Mr. Williams. Moreover, statements defendant made after the shooting to the authorities also conveyed his position that he shot Mr. Williams in order to protect himself. If defendant's testimony was believed, it only reasonably supported a finding that he was attempting to protect himself when he shot Mr. Williams; that is, he was acting out of fear, *Page 12 
not passion or rage. Considering the evidence presented at trial, we resolve that no reasonable jury could have concluded that defendant actually was under the influence of sudden passion or in a sudden fit of rage when he shot and killed Mr. Williams.
 {¶ 27} Based on the foregoing, we conclude that the trial court did not err in not instructing the jury on the issue of voluntary manslaughter. Clearly, the evidence presented at trial supported a jury instruction on the issue of self-defense, which was given; however, it did not also support an instruction on voluntary manslaughter. Consequently, we overrule defendant's single assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 KLATT, J., concurs. WHITESIDE, J., dissents. WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.