[Cite as *State v. A.H.*, 2017-Ohio-7680.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

     Plaintiff-Appellee,                 :

                                 No. 16AP-487

v.                                             :          (C.P.C. No. 15CR-745)

[A.H.],                                        :          (REGULAR CALENDAR)

     Defendant-Appellant.             :

---

D E C I S I O N

Rendered on September 19, 2017

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

**On brief:** *Campbell Law, LLC*, and *April F. Campbell*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, A.H., appeals from a judgment of the Franklin County Court of Common Pleas convicting him of rape, in violation of R.C. 2907.02. Before this court is a counseled brief filed pursuant to *Anders v. California*, 386 U.S. 738 (1967). For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On February 13, 2015, a Franklin County Grand Jury indicted appellant on four counts of rape involving two child victims, A.G. and B.G., which occurred between June 9, 2014 and February 4, 2015. Counts One and Two charged appellant with vaginal rape of A.G., a person less than 13 years of age. Count Three charged appellant with vaginal rape of B.G., where appellant purposely compelled B.G. to submit by force or

threat of force. Count Four charged appellant with rape by digital penetration where appellant compelled B.G. to submit by force or threat of force.

{¶ 3} The children's mother, T.G., met appellant in 2010 and the two began a sexual relationship. Two or three years later, T.G. moved herself and her two girls, A.G. and B.G., into a residence with appellant and several other individuals on Livingston Avenue in Columbus, Ohio. After two months, appellant, T.G., and her two girls moved into a two-bedroom residence on Atwood Terrace in Columbus, Ohio, with appellant's friend. According to witnesses, appellant and T.G. slept in one bedroom and the two girls slept on the couch in the living room. The friend slept in the other bedroom. B.G. was 13 years old at the time and A.G. was 6 or 7 years old.

{¶ 4} Following a voir dire of A.G. for competency, the trial court found A.G. competent to give testimony in this matter. According to A.G., appellant "raped" her on more than one occasion while she was living with him at the Atwood Terrace residence. (Tr. Vol. II at 228.) A.G. testified that appellant did so by touching her "front area" with his "bottom area." (Tr. Vol. II at 228, 229.) She described appellant's "bottom area" as the area he used to go to the bathroom. A.G. related that her mom would touch appellant while appellant was touching her. A.G. stated that appellant raped her "the first time" when she was six or seven years old. (Tr. Vol. II at 230.) When she told her mom that she did not like it when appellant touched her, the touching stopped for "a little" while but continued when her mom was not around. (Tr. Vol. II at 235.) A.G. testified that appellant also tried to make her touch him. According to A.G., she walked in on appellant when he was touching her older sister B.G. in the same way. A.G. stated that her mom was on the bed with appellant and B.G. at the time.

{¶ 5} On February 7, 2015, A.G. told her friend's mother, R.D., about the sexual abuse by appellant. R.D. testified that her home is four doors down from A.G.'s home and that A.G. was visiting with her daughter on February 7, 2015. According to R.D., A.G. began crying and told R.D. that she was scared to go home because appellant was raping her while her mother held her down. R.D. immediately called the Columbus Division of Police, who dispatched an officer to her home. Officer Ian Pruitt responded to the call. After speaking with R.D. and A.G., Pruitt contacted the sexual assault unit.

{¶ 6} A.G. was taken to Nationwide Children's Hospital where Candell Looman conducted an interview. Looman is a licensed social worker with specialized training as a forensic child interviewer. According to Looman, A.G. described sexual abuse by appellant, with the aide of an anatomical doll. A.G. told Looman that appellant had taken his pants off and tried to put his "thing" into her "private." (Tr. Vol. II at 324.) Looman understood A.G. to mean that appellant attempted to put his penis in her vagina. A.G. told Looman that on another occasion appellant put his thing "on her" private but that A.G. was not able to clarify whether that meant inside or outside of her vagina. (Tr. Vol. II at 325.) A.G. told Looman that her mother would spank her if she tried to get away from appellant. A.G. also told Looman that "the last instance" of rape occurred just three days earlier. (Tr. Vol. IV at 709.)

{¶ 7} A.G.'s older sister B.G. was 14 years old at the time of trial. She testified that appellant started sexually abusing her when the family lived at the Livingston Avenue residence. She stated that the she, A.G., her mother, and appellant all slept on the floor because they did not have a bed. According to B.G., she woke one evening to see her mother and appellant having sex and that appellant reached down her pants. B.G. stated that appellant put his hand inside her vagina and "it kind of hurt * * * like cutting me or something sharp." (Tr. Vol. II at 262.) She claimed that appellant repeated this conduct on several other occasions.

{¶ 8} After the move to the Atwood Terrace residence, appellant continued to sexually abuse B.G. B.G. testified that on one occasion while her mother was in the bathroom and she was sleeping in bed, appellant woke her, rolled her over, opened her legs, and tried to stick his penis in her vagina. According to B.G., appellant was holding his penis and attempting to guide it into her vagina. B.G. testified that as appellant did this, she "felt a pinch" and "it hurt." (Tr. Vol. II at 267.) The prosecutor followed up on this testimony as follows:

> Q. Where did you feel the pinch?
>
> A. Like on my vagina.
>
> Q. So some of his penis touched your vagina hole is what you're saying to the point where you feel a pinch inside?

A.  (Witness nods.)

(Tr. Vol. II at 267.)

{¶ 9}  B.G. related that during the next incident, appellant became more aggressive, telling her that he wanted to take her virginity.  B.G. testified that on several occasions, appellant "put his tongue on my vagina and did stuff down there.  Like instead of using his penis, he used his tongue."  (Tr. Vol. II at 269.)  During a subsequent visit from her father, R.G., B.G. slipped him a note informing him that she wanted to live with him.  She did not give a reason in the note.  After he received the note, R.G. picked up B.G. from school in the afternoon and moved her into his home in Grove City, Ohio.  Though T.G. had legal custody of B.G. pursuant to a divorce decree, she did not object when B.G. moved out.

{¶ 10}  Jennifer Sherfield, a licensed social worker and forensic interviewer/mental health advocate, interviewed B.G. shortly after A.G. revealed appellant's sexual abuse.  According to Sherfield, B.G. cried as she described the sexual abuse by appellant.  B.G. told Sherfield that appellant tried to take her virginity.  B.G. described an incident where she was sleeping in the bedroom wearing only a T-shirt and appellant woke her, rolled her over, and began rubbing his penis as he attempted to guide his penis into her vagina.  B.G. described a pinching sensation and "poking" that "felt like it was tearing the hole of her vagina."  (Tr. Vol. III at 503-04.)  B.G. told Sherfield that when she informed her mother about the incident, her mother "hit her upside the head and said that she was trying to break them up and called her unloyal."  (Tr. Vol. III at 504.)  B.G. described another incident where her mother told her to let appellant perform sexual acts on her while her mother watched.  "She talked about his fingers going inside of her vagina."  (Tr. Vol. III at 504.)

{¶ 11}  T.G. agreed to testify for the prosecution, pursuant to a written agreement which required her to plead guilty to two of the four rape charges against her, and to testify truthfully at the criminal proceedings against appellant. In return for her testimony, the prosecutor agreed to recommend a ten-year mandatory prison sentence, registration as a Tier III sex offender, and five years of post-release control.  At trial, when the prosecutor asked T.G. why she was there, she answered: "To testify against my co-

defendant and to tell the truth about what happened against my daughters -- for my daughters and what happened." (Tr. Vol. III at 561.) T.G. testified that appellant sexually assaulted both of her daughters in her presence and that she "participated" in the abuse. (Tr. Vol. III at 589.)

{¶ 12} T.G. stated that on two occasions, she witnessed appellant licking A.G.'s vagina. On another occasion, she witnessed appellant rubbing his penis on A.G.'s vagina and putting it inside her vagina. On that occasion, she was in the bed with appellant and her daughter. T.G. recalled that A.G. had just gotten out of the shower and had gotten in bed with a towel wrapped around her. T.G. testified regarding the incident as follows:

> Q. What do you mean that he was rubbing his penis on her vagina?
>
> A. He was taking his penis and rubbing his penis on her vagina.
>
> Q. What part of her vagina?
>
> A. Her vagina -- inside her vagina, like her vagina.
>
> Q. Between the lips of her vagina?
>
> A. Yeah, yes.

(Tr. Vol. III at 590.)

{¶ 13} When the prosecutor asked T.G. how many times she saw appellant rubbing his penis on A.G.'s vagina in this manner, she responded "[l]ike maybe a couple times." (Tr. Vol. III at 592.) According to T.G., she cried when appellant began sexually assaulting her daughter and told appellant to stop. T.G. stated that when she tried to stop appellant, "he would tell me to shut up and stuff like that and he would smack me." (Tr. Vol. III at 591.) T.G. testified that she saw appellant abuse A.G. in this manner "[l]ike two or three times. * * * It was mostly with [B.G.]." (Tr. Vol. III at 592.) T.G. stated that A.G. was eight years old when the abuse occurred. With regard to the abuse of her thirteen-year-old daughter B.G., T.G. testified that she witnessed appellant licking B.G.'s vagina on more than one occasion. On one such occasion, appellant did so while having intercourse

with T.G.  T.G. also witnessed appellant put his fingers inside B.G.'s vagina.  She also recalled appellant mentioning that he wanted to take B.G.'s virginity.

{¶ 14} Appellant took the witness stand in his own defense and denied the allegations of sexual abuse.  According to appellant, A.G., B.G., and T.G. lied to the jury for no reason.

{¶ 15} The jury convicted appellant of Counts One and Two of the indictment, charging appellant with rape of A.G.  The jury also convicted appellant of Counts Three and Four of the indictment, charging appellant with rape of B.G.  The trial court convicted appellant of all four counts of rape and sentenced appellant to concurrent prison terms of life without parole as to Counts One and Two, and concurrent prison terms of 11 years as to Counts Three and Four.  The trial court ordered appellant to serve Counts One and Three consecutive to one another.

{¶ 16} Though appellant timely appealed to this court from the judgment of the trial court, his appellate counsel elected to file an *Anders* brief on appellant's behalf.  In *State v. Matthews*, 10th Dist. No. 11AP-532, 2012-Ohio-1154, this court reviewed the procedure an appellate court must follow as established in *Anders*:

> In *Anders*, the United States Supreme Court held that if, after a conscientious examination of the record, a defendant's counsel concludes that the case is wholly frivolous, she should so advise the court and request permission to withdraw.  *Id.* at 744.  Counsel must accompany her request with a brief identifying anything in the record that could arguably support the client's appeal.  *Id.*  Counsel also must: (1) furnish the client with a copy of the brief and request to withdraw; and (2) allow the client sufficient time to raise any matters that the client chooses.  *Id.*

*Matthews* at ¶ 9.

{¶ 17} Here, appellant's counsel filed a brief, pursuant to *Anders*, in which he asserted two potential assignments of error for our review.  Additionally, in accordance with *Anders*, counsel furnished appellant with a copy of the brief and motion, "along with a letter explaining Appellant's right to file a pro se brief in this matter."  (Feb. 20, 2017 Mot. to Withdraw.)  After receiving the *Anders* brief filed by counsel, this court notified appellant of his appellate counsel's representations, granted counsel's motion to

withdraw, and granted appellant leave until April 24, 2017 to file a supplemental brief. (Feb. 22, 2017 Entry.)  Appellant did not file a supplemental brief.

{¶ 18} Where a defendant does not file a pro se brief in response to an *Anders* brief, an appellate court will examine the potential assignment of error and the entire record below to determine if the appeal lacks merit.  *State v. Cooper*, 10th Dist. No. 09AP-511, 2009-Ohio-6275.  "After fully examining the proceedings below, if we find only frivolous issues on appeal, we then may proceed to address the case on its merits without affording appellant the assistance of counsel."  *Matthews* at ¶ 10, citing *Penson v. Ohio*, 488 U.S. 75, 80 (1988).  However, if we conclude that there are nonfrivolous issues for appeal, we must afford appellant the assistance of counsel to address those issues.  *Anders* at 744; *Penson* at 80.

## II.  POTENTIAL ASSIGNMENTS OF ERROR

{¶ 19} Appellant asserts two potential assignments of error as follows:

> [1.]  Are [appellant's] rape convictions insufficiently supported by the evidence, or against the manifest weight of the evidence?
>
> [2.]  Did the trial court err in deciding not to instruct the jury on the lesser-included offense of sexual battery for counts three and four?

## III.  LEGAL ANALYSIS

### A.  First Potential Assignment of Error

{¶ 20} In appellant's first potential assignment of error, appellant argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.  We disagree.

{¶ 21} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law, not fact.  *Id.*  In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio

St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 22} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. *In re C.S.*, 10th Dist. No. 11AP-667, 2012-Ohio-2988, ¶ 29, quoting *State v. West*, 10th Dist. No. 06AP-111, 2006-Ohio-6259, ¶ 16 ("[A] 'victim's testimony alone is sufficient to support the conviction for sexual assault.' ").

{¶ 23} "Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence." *State v. McCombs*, 10th Dist. No. 15AP-245, 2015-Ohio-3848, ¶ 3, citing *Thompkins* at 387. "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38.

{¶ 24} When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio

App.3d 172, 175 (1st Dist.1983).  An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 25} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses.  *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6.  However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "  *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  "Accordingly, we afford great deference to the jury's determination of witness credibility."  *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14.  "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds."  *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

1.  *The Convictions Are Supported by Sufficient Evidence*

{¶ 26} R.C. 2907.02 defines the offense of rape, in relevant part, as follows:

> (A)(1)  No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:
>
> * * *
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
>
> * * *
>
> (2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

{¶ 27} "Sexual conduct" is defined in R.C. 2907.01(A), in relevant part, as "vaginal intercourse between a male and female; * * * and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into

the vaginal * * * opening of another.  Penetration, however slight, is sufficient to complete vaginal * * * intercourse."  "In this context, the vaginal opening includes the labia majora." *State v. Carroll*, 10th Dist. No. 15AP-409, 2015-Ohio-5577, ¶ 34, citing *State v. Gilbert*, 10th Dist. No. 04AP-933, 2005-Ohio-5536, ¶ 35-36.

{¶ 28} With respect to victim A.G, the testimony provides sufficient evidence for the jury to find, beyond a reasonable doubt, that appellant engaged in sexual conduct with her as R.C. 2907.01(A) defines that term and that appellant committed rape as defined in R.C. 2907.02(A)(1)(b).  Under R.C. 2907.01 and 2907.02, insertion, however slight, of any part of the body into the vaginal cavity of another is sufficient to complete vaginal intercourse.  *State v. Edinger*, 10th Dist. No. 05AP-31, 2006-Ohio-1527, ¶ 41.  A.G. testified that appellant had taken his pants off and tried to put his "thing" into her "private."  (Tr. Vol. II at 324.)  Looman understood A.G. to mean that appellant attempted to put his penis in her vagina.  A.G. testified that appellant raped her the first time when she was six or seven years old and the last time when she was eight years old.  T.G. testified that she witnessed appellant stick his penis inside A.G.'s vagina more than once.  Such testimony, when viewed in a light most favorable to the prosecution, is sufficient to prove appellant's guilt of two counts of rape beyond a reasonable doubt.

{¶ 29} With regard to B.G., the testimony provides sufficient evidence for the jury to find, beyond a reasonable doubt, that appellant engaged in sexual conduct with her as R.C. 2907.01(A) defines that term and that appellant committed rape as defined in R.C. 2907.02(A)(2).  B.G. testified that appellant had inserted his hand into her vagina on one occasion and that she "felt a pinch" and "it hurt" when appellant attempted to guide his penis into her vagina on another occasion.  (Tr. Vol. II at 267.)  T.G. responded in the affirmative when the prosecutor asked her if she had witnessed appellant rubbing his penis between the lips of B.G.'s vagina.  Such testimony, when viewed in a light most favorable to the prosecution is sufficient to establish that appellant engaged in "sexual conduct" with B.G. on more than one occasion.  *Id.* (rape conviction supported by sufficient evidence of sexual conduct where defendant admitted placing his finger inside the victim's vagina); *State v. Childers*, 10th Dist. No. 96APA05-640 (Dec. 19, 1996) ("entry of the anterior of the female genital organ, known as the vulva or labia, is sufficient penetration to constitute rape").

{¶ 30} As to the use of force or threat of force required for a rape conviction, the Supreme Court of Ohio has stated that " '[f]orce need not be overt and physically brutal, but can be subtle and psychological.  As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.' " *State v. Eskridge*, 38 Ohio St.3d 56, 58-59 (1988), quoting *State v. Fowler*, 27 Ohio App.3d 149, 154 (8th Dist.1985).  When " 'confronted with a child being told to do something by an important figure of authority, and commanded not to tell anyone about it [there is] nothing unreasonable about a finding that the child's will was overcome.' " *Eskridge* at 59, quoting *Fowler* at 154.  Consequently, under such circumstances, the forcible element of rape properly is established.  *Eskridge* at 59.

{¶ 31} Here, B.G. testified that she was crying while appellant sexually assaulted her and that she was "scared * * * to know that my mom wouldn't help me."  (Tr. Vol. II at 268.)  When the prosecutor asked B.G. why she did not tell anyone about the sexual abuse, she answered "I would never bring up anything like this because I was always scared at the time because I was worried about my mom because I thought he was a scary man.  Like he -- the stuff I heard about him, like I thought he could possibly kill my mom or something."  (Tr. Vol. II at 269.)  B.G. also told Sherfield that when she moved her leg to stop appellant from trying to enter her vagina, he "slapped her leg and left the room."  (Tr. Vol. III at 504.)  B.G. testified that she decided to write the note to her father because "when I said no this time, [appellant] was being more like aggressive."  (Tr. Vol. II at 268.)  T.G. testified that appellant was frequently verbally and physically abusive to her and that the children witnessed this behavior.  Such evidence, when viewed in a light most favorable to the prosecution, is sufficient to establish the use of force or the threat of force necessary to sustain appellant's conviction of two counts of rape against B.G. beyond a reasonable doubt.

**2.** *Appellant's Convictions Are Not Against the Manifest Weight of the Evidence*

{¶ 32} As set out above, the testimony of the two victims, if believed, is sufficient to sustain appellant's convictions for rape.  As to the weight of the evidence, T.G. corroborated the essential details of her daughters' testimonies regarding the sexual abuse by appellant.  Appellant's trial counsel pointed out on cross-examination that T.G. had

"cut a deal" with the prosecutor in exchange for her testimony. (Tr. Vol. III at 604.) We note that although T.G. did escape a possible life sentence, her agreement with the prosecutor required her to plead guilty to rape against both of her daughters and that, in addition to Tier III sexual offender registration and five years of post-release control, T.G. agreed to a recommended prison sentence of ten years without the possibility of an early release. T.G. also admitted that she participated in the sexual abuse by appellant and that in doing so, she "fail[ed]" both of her daughters. (Tr. Vol. III at 634.) It was the job of the jury to assess T.G.'s credibility and to determine whether T.G. testified falsely. *Thompkins*; *Albert*. Given the consistency in the trial testimony of the two victims with the testimony of their mother who witnessed the abuse, we cannot say that the jury lost its way in resolving issues of weight and credibility in reaching their verdict. Moreover, as noted above, in her interview with Looman, A.G.'s description of the sexual abuse she suffered at appellant's hands was consistent with A.G.'s trial testimony. Similarly, in her interview with Sherfield, B.G. told essentially the same story of appellant's sexual abuse that she told the jury at trial.

{¶ 33} Appellant testified that the victims and their mother lied to the jury, and he denied sexual conduct with either of the two victims. The jury obviously disbelieved appellant. We afford great deference to the jury's determination of witness credibility. *Albert* at ¶ 14. In our view, the record contains overwhelming evidence of appellant's guilt of the offenses of which he was convicted, his denials notwithstanding.

{¶ 34} For the foregoing reasons, appellant's first potential assignment of error is overruled.

## B. Second Potential Assignment of Error

{¶ 35} In his second potential assignment of error, appellant argues that the trial court abused its discretion by failing to instruct the jury that they could find appellant guilty of sexual battery as to the two counts in the indictment related to B.G. Specifically, appellant's trial counsel requested a jury charge on the offense of sexual battery as defined in R.C. 2907.03(A)(5). R.C. 2907.03(A)(5) defines the offense of sexual battery, in relevant part, as follows:

> No person shall engage in sexual conduct with another, not
> the spouse of the offender, when any of the following apply:

* * *

> The offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person.

{¶ 36} "R.C. 2907.03(A)(5) prohibits incestuous conduct, defining it in broader terms than formerly, so as to include not only sexual conduct by a natural parent with his child, but also sexual conduct by a stepparent with his stepchild, a guardian with his ward, or a custodian or person in loco parentis with his charge." *State v. Benson*, 81 Ohio App.3d 697, 701 (4th Dist.1992). "Courts examining R.C. 2907.03(A)(5) have found the statute clear and unambiguous in its criminalization of all sexual conduct falling within its purview, regardless of a victim's age or consent." *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, ¶ 14. Thus, R.C. 2907.03(A)(5) applies to a parent or a person in loco parentis who has consensual sex with his or her adult child. *Id.* at ¶ 27.

{¶ 37} "A trial court must give all instructions which are 'relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder.' " *State v. Oliveira*, 10th Dist. No. 14AP-501, 2015-Ohio-2652, ¶ 9, quoting *State v. Joy*, 74 Ohio St.3d 178, 181 (1995), citing *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. " 'When reviewing a trial court's jury instruction, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction was an abuse of discretion under the facts and circumstances of the case.' " *Oliveira* at ¶ 9, quoting *State v. Gover*, 10th Dist. No. 05AP-1034, 2006-Ohio-4338, ¶ 22, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989).

{¶ 38} Appellant contends that the trial court erred by refusing to instruct the jury on the offense of sexual battery under R.C. 2907.03(A)(5) because the evidence shows that appellant is a person in loco parentis of B.G. The trial court refused to give the requested instruction because there was no evidence to support a finding that the sexual conduct with B.G. was consensual. We agree with the trial court.

{¶ 39} As noted above, B.G.'s testimony is sufficient to permit a jury to find that appellant compelled her to engage in sexual conduct on more than one occasion by force or threat of force. Both T.G. and Sherfield corroborated B.G.'s testimony. Appellant simply denied any sexual conduct with B.G., consensual or otherwise. Appellant did not

advance a theory at trial that B.G consented to sexual conduct, and there is no such evidence in the record. Thus, appellant was not entitled to a jury instruction on sexual battery, pursuant to R.C. 2907.03(A)(5), even though the evidence arguably supports a finding that appellant is a person in loco parentis of B.G. Accordingly, we find that the trial court did not abuse its discretion in declining to so instruct the jury.

{¶ 40} For the foregoing reasons, because we find no merit in appellant's second potential assignment of error, it is overruled.

## IV. CONCLUSION

{¶ 41} Following our review of appellant's two potential assignments of error asserted in the *Anders* brief and our independent review of the record, we find that the potential assignments of error lack merit. Additionally, we are unable to find any nonfrivolous issues for appeal. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and BRUNNER, JJ., concur.

_____