[Cite as *In re J.L.*, 2020-Ohio-5254.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE J.L.

A MINOR CHILD

[Appeal by J.A., Mother]

No. 109626

JOURNAL ENTRY AND OPINION

**JUDGMENT:** DISMISSED
**RELEASED AND JOURNALIZED:** November 12, 2020

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 18905081

### *Appearances:*

Scalise Legal Services, L.L.C., and Stephanie B. Scalise, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant-mother J.A. ("Mother") appeals the decision of the Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile court") terminating her parental rights and granting permanent custody of her son J.L. (d.o.b. December 5, 2006) to appellee, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or the "agency").

{¶ 2} Mother's appointed counsel has filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), in which

she asserts that (1) despite multiple attempts, she has been unable to locate and communicate with Mother regarding her goals and wishes in this case and (2) she cannot find any meritorious issue for appellate review. This court held the motion in abeyance and afforded Mother an opportunity to file a pro se brief. Mother has failed to avail herself of that opportunity. Following our own independent review, this court grants appointed counsel's motion to withdraw, and we dismiss the appeal.

**Factual Background and Procedural History**

{¶ 3} On April 18, 2018, CCDCFS filed a complaint for neglect and protective supervision. The complaint alleged that Mother and J.L.'s alleged father, J.L., Sr. ("Father"), had failed to meet J.L.'s basic needs on a consistent basis, including providing adequate food, clothing and shoes for J.L. and ensuring that J.L. attended school on a regular basis. The complaint further alleged that Mother and Father had failed to address J.L.'s special needs, including refusing to attend meetings at school to discuss his Individualized Education Plan ("IEP"), and that J.L. had appeared at school with soiled clothing and poor hygiene. The complaint also alleged that Mother had an unresolved criminal matter for drug possession and possession of criminal tools and that Father had failed to establish paternity and had failed to support, visit or communicate with J.L. since birth. The agency requested a disposition of legal custody to Mother with protective supervision to CCDCFS.

{¶ 4} On June 1, 2018, CCDCFS filed an amended complaint, amending the dispositional prayer of the complaint from protective supervision to temporary

custody to CCDCFS. The agency also filed a motion for predispositional temporary custody. In support of the motion, the agency attached an affidavit from CCDCFS social worker Megan Sunyak in which she averred that Mother had failed to care for J.L., that, on a regular basis, Mother's whereabouts were unknown and that Mother had left J.L. with Father, who was "overwhelmed" and unable to care for J.L. Sunyak further averred that there were no known relatives who were able to care for J.L. The juvenile court granted emergency temporary custody of J.L. to the agency. On June 28, 2018, J.L. was removed from Mother's custody. Shortly thereafter, J.L. was placed with a foster family.

{¶ 5} J.L. has a brother, P.L., who was also removed from his Mother's custody in or around this time. P.L. was placed with maternal cousins.

{¶ 6} On August 31, 2018, the guardian ad litem filed an initial report and recommendation. She reported that J.L. and P.L. had been removed from their parents' care due to Mother's legal issues and Mother and Father's substance abuse, housing issues and "general neglect of the children." The guardian ad litem indicated that it had been reported that J.L. and P.L. were sent to school unbathed in dirty clothing, that no arrangements had been made for them to eat throughout the day and that the parents did not bring the children to necessary medical appointments. The guardian ad litem reported that J.L. has "severe special needs" and that although he is "mostly nonverbal," he seems to understand "almost everything" that is said to him. She indicated that the parents had "a huge task in front of them" if they wanted their children returned to their care and custody,

including finding employment and independent housing, addressing their substance abuse issues and learning how to parent their children and accommodate J.L.'s special needs. The guardian ad litem recommended that temporary custody be granted to the agency.

{¶ 7} On November 28, 2018, the magistrate conducted an adjudicatory hearing. On December 21, 2018, J.L. was adjudicated to be neglected. On February 5, 2019, emergency custody was terminated, and J.L. was committed to the temporary custody of CCDCFS.

{¶ 8} CCDCFS filed a case plan that required Mother to complete a substance abuse assessment and comply with any recommendations, to submit to drug screens, to obtain stable housing and to demonstrate the ability to meet J.L.'s basic and special needs, including his educational and medical needs. The permanency goal was reunification with Mother. The juvenile court approved the case plan.

{¶ 9} On May 1, 2019, CCDCFS filed a motion to modify temporary custody to permanent custody. In an affidavit submitted in support of the motion, CCDCFS social worker Ariana Bey averred that Mother had failed to address her substance abuse issues and that Mother and Father did not have stable housing, had failed to follow up with medical providers and services for J.L. and had failed to demonstrate that they could provide for J.L.'s special needs. She also averred that Father had failed to make himself available for case plan services and had abandoned J.L.

**{¶ 10}** On May 23, 2019, the guardian ad litem filed an updated report and recommendation. The guardian ad litem reported that since his removal from Mother's custody, J.L. had been living in a specialized foster home, was regularly seeing medical specialists for the first time and was doing "very well" both at home and at school. The guardian ad litem further reported that neither Mother nor Father had made "any effort to work on case plan services," that both parents had "disappeared" during the pendency of the case — "eventually turning up in county jail" — and that neither parent "appear[ed] interested or capable of caring for their children." Based on the progress J.L. had made while in custody and the fact that his parents had "shown no interest" in him, the guardian ad litem recommended that permanent custody of J.L. be granted to CCDCFS.

**Hearing on Motion for Permanent Custody**

**{¶ 11}** On January 28, 2020, the juvenile court held a hearing on the agency's motion for permanent custody. At that time, J.L. was 13 and had been living with a foster family for more than 18 months. Mother was transported from the Medina County Jail to attend the hearing. Father did not attend the hearing.

**{¶ 12}** At the outset of the hearing, counsel for Mother and Father made oral motions for the extension of temporary custody.

**{¶ 13}** Two witnesses testified on behalf of CCDCFS at the permanent custody hearing — M.W., J.L.'s foster mother ("Foster Mother"), and CCDCFS social worker Ariana Bey.

{¶ 14} Foster Mother testified that J.L. was placed with her family on July 5, 2018 and had been living with the family continuously since that time. She indicated that she and her husband are licensed therapeutic foster parents and that they specialize in special needs children, including deaf children, autistic children and children with mobility issues, and sibling groups. Foster Mother described J.L. as a "nonverbal child who also presented with autistic-like behaviors." She indicated that when J.L. was first placed with them, she had been told that he had been diagnosed with a craniofacial deformity, craniosynostosis. Foster Mother stated that after J.L. was placed with them, he began regularly seeing a neurodevelopment pediatrician and neurologist, who identified other medical conditions, and a physiatrist, who deals with walking and gait training.

{¶ 15} Foster Mother indicated that J.L. has only a few words that he uses and that he has trouble putting words together but that his receptive language is "very good" and that he can express his needs and wants by gesturing or nodding or shaking his head. Foster Mother indicated that they are working on sign language with him but that J.L.'s progress is complicated by his vision issues.

{¶ 16} Foster Mother testified that J.L. has been diagnosed with cortical vision impairment or cerebral vision impairment (which means his brain does not interpret what he's seeing) and strabismus (a turning of the eye). She indicated that J.L. sees an eye specialist and has had eye surgery. She indicated that J.L. has also been diagnosed with a seizure disorder and now takes daily seizure medication,

which has made him "a new kid," "way more alert" and "engaged with the people around him," but that emergency medicine must be kept on hand at all times.

{¶ 17} Foster Mother indicated that when J.L. initially came to live with them, J.L. also saw a cardiologist for a heart deformity he had had since birth and a gastroenterologist for gastric problems he was then experiencing. She stated, however, that those issues had resolved.

{¶ 18} Foster Mother indicated that J.L. is in an inclusion classroom in Hudson City Schools where the children all have similar developmental issues. She stated that J.L. has an IEP with speech and language goals and occupational and physical therapy goals and that he also works with a teacher for the visually impaired. Foster Mother stated that another foster sibling is in the same classroom and that J.L. loves school.

{¶ 19} Foster Mother testified that she currently has five other minor children at home — four adopted children with special needs and one other foster child with special needs — all of whom are 12 or 13 years old. She stated that two of her adult children also currently live with her — an adult daughter, who is a registered nurse, and an adult son, who is a high school science teacher. Foster Mother indicated J.L. loves his foster family, that he is a "blessing" to the family and that he regularly interacts with and goes to church and on other outings with his foster family.

{¶ 20} Foster Mother testified that routines are a critical aspect of J.L.'s life and care. She indicated that J.L. requires regular medication and that J.L. is not

potty-trained, will likely never be potty-trained and is, therefore, on a bowel regimen. She stated that J.L. can partially feed himself but, at times, requires assistance with eating and also requires assistance getting dressed. She indicated that J.L. wears braces on his legs and, in unfamiliar settings, does best when in a therapeutic stroller.

{¶ 21} Foster Mother testified that neither Mother nor Father had ever visited J.L. during the time he had been placed with their family but that J.L. has had regular visits with his brother and extended family and is "excited" for those visits. Foster Mother stated that she believed it was important for J.L. to maintain relationships with his brother and extended family and that if permanent custody of J.L. was granted to CCDCFS, she would ensure that J.L.'s connection to his brother and extended family was maintained, as she does for her other adopted children.

{¶ 22} Bey testified that she was assigned to the case in April 2018. She indicated that J.L. came into CCDCFS custody in June 2018 due to "medical and educational neglect" after it was reported to the agency that J.L. was missing school and that when he was sent to school, he had unclean clothes, inappropriate undergarments, was wearing shoes that were too small for him and was not given a lunch or money to purchase lunch.

{¶ 23} Bey testified that Mother's case plan included completing parenting classes, complying with mental health services and substance abuse services and all recommendations made by the service providers, maintaining stable housing, following up with medical service providers for J.L. and demonstrating an ability to

meet J.L.'s basic and special needs. Bey testified that she believed the "root cause" of Mother and Father's inability to care for their children was substance abuse.

{¶ 24} Bey testified that the only time she ever observed Mother with J.L. was prior to his removal from Mother's care and custody. Bey indicated that she had provided Mother with a referral for developmental disability services and asked Mother to follow up with medical providers regarding J.L.'s initial diagnosis of craniosynostosis, but that Mother never followed through. Bey stated that she had approximately three home visits with the family prior to the removal of the children and that, at the time, Mother and the children were staying with a family friend. She indicated that when she visited the home, P.L. would be gone and that J.L. would normally be in the front of Mother's car or in the home "just laying there." Bey testified that she saw no signs of physical abuse but that J.L.'s parents "were not * * * attentive to his needs" and that "[i]t was just kind of like he was just there." Bey described one visit where J.L. had on unclean clothes and there were gnats flying around his face.

{¶ 25} Bey testified that she soon lost contact with Mother and Mother's whereabouts were unknown. Bey stated that she later learned that Mother was incarcerated in the Medina County Jail. She indicated that Mother was in and out of jail from May 2018 until July 2019. Bey testified that whenever she learned Mother had been released from jail, she would reach out to Mother to see if Mother wanted to reconnect, initiate visits with her children or engage in services. Bey testified that when Mother resurfaced in July 2019, she made referrals for Mother

for mental health services, substance abuse services and parenting classes. Bey stated that Mother completed an intensive inpatient substance abuse program but refused to comply with the recommended after care because she did not want to stay in the recovery house. Bey indicated that in December 2019, she asked Mother to submit to a drug screen but that Mother did not comply. Shortly thereafter, Bey learned Mother was back in jail.

{¶ 26} Bey testified that neither Mother nor Father ever visited with J.L. after he was in agency custody. Bey stated that in or around April 2019, shortly after she had visited P.L., Mother requested a visit with J.L., but that Mother was reincarcerated before the visit could be arranged.

{¶ 27} Bey testified that Father never established paternity or engaged in services and that Father's current whereabouts were unknown. She indicated that her last contact with Father was in June 2018 and that subsequent efforts to contact Father were unsuccessful. Bey stated that the agency had spoken with several members of J.L.'s extended family to see if they could be a possible placement for J.L. but that no one could meet his substantial medical needs.

{¶ 28} Bey testified that J.L. had "flourished" while in foster care and was now "thriving." She indicated that J.L. appeared to have been malnourished previously and had "really grown" since he was removed from his Mother's custody. Bey stated that J.L. had made "significant progress" both at school and at home and that his medical needs were being met. Bey indicated that J.L. had had eye surgery and now wears glasses, that he was walking straighter as a result of new orthotics he

had received and that the family "has done a lot of different things to help the child improve with his quality of life," including engaging in therapies and doing various activities with him.

{¶ 29} Bey testified that, in her view, it was important to J.L.'s well-being that he remain in his current placement to ensure the consistency of his medical care and because of the close, interactive relationship he has with his foster family. Bey stated that the agency believed it was in J.L.'s best interest to grant permanent custody to the agency rather than extend temporary custody because (1) J.L. had already been in agency custody for 18 months, (2) J.L. needs and deserves permanency, stability and consistency, (3) J.L. was comfortable in his placement, (4) the foster family was providing for all of his basic, medical and educational needs "to the highest ability that they can" and (5) Mother had made no effort to maintain a connection with J.L. or to develop the skills and resources necessary to "effectively care for" J.L. Bey indicated that, as of the date of the hearing, it was anticipated that Mother would remain incarcerated for another six months.

{¶ 30} Mother did not testify and did not present any witnesses at the hearing.

{¶ 31} The juvenile court also heard from J.L.'s court-appointed special advocate and J.L.'s guardian ad litem. Based on the significant progress J.L. had made while in foster care, the level of care he was receiving in his current placement and the parents' lack of involvement, both J.L.'s court-appointed special advocate

and J.L.'s guardian ad litem recommended granting permanent custody of J.L. to CCDCFS in the hope that he would be able to remain with his current foster family.

**The Juvenile Court's Decision to Grant Permanent Custody to CCDCFS**

{¶ 32} On February 20, 2020, the juvenile court granted CCDCFS' motion to modify temporary custody to permanent custody, terminating the parental rights of Mother and Father and awarding permanent custody of J.L. to CCDCFS. Based on the evidence presented at the hearing and the recommendation of the guardian ad litem, the juvenile court found, by clear and convincing evidence, that the agency had proven the allegations of its motion, that J.L. had been abandoned and could not be placed with either parent within a reasonable time or should not be placed with his parents and that it was in J.L.'s best interest to grant permanent custody to the agency.

**Law and Analysis**

***Anders* Standard**

{¶ 33} *Anders* outlines the procedure that counsel must follow to withdraw due to the lack of any meritorious grounds for appeal. *Anders*, 386 U.S. at 744, 87 S.Ct. 1396, 18 L.Ed.2d 493. In *Anders*, the United States Supreme Court held that if appointed counsel, after a conscientious examination of the case, determines an appeal to be wholly frivolous, he or she should advise the court of that fact and request permission to withdraw. *Id.* This request, however, must be accompanied by a brief identifying anything in the record that could arguably support the appeal.

*Id.* Counsel must also provide the client with a copy of the brief and allow the client sufficient time to file his or her own brief. *Id.*

{¶ 34} Once the appellant's counsel satisfies these requirements, this court must fully examine the proceedings below to determine if any arguably meritorious issues exist. *Id.* If the court determines that the appeal is wholly frivolous, the court may grant counsel's request to withdraw and dismiss the appeal. *Id.*; *see also State v. Sims*, 8th Dist. Cuyahoga No. 107724, 2019-Ohio-4975, ¶ 7-9.

{¶ 35} Although *Anders* arose in a criminal context, this court has applied *Anders* in appeals involving the termination of parental rights. *See, e.g., In re A.M.*, 8th Dist. Cuyahoga No. 106789, 2018-Ohio-3186; *In re C.S.*, 8th Dist. Cuyahoga No. 105700, 2017-Ohio-8664.

{¶ 36} Previously, former Loc.App.R. 16(C) set forth the specific procedure governing *Anders* briefs and motions to withdraw followed by this court. That rule was amended on February 1, 2019 and no longer includes any procedure for the filing of *Anders* briefs. However, as this court has previously stated, "the absence of a local rule governing *Anders* briefs does not prevent this court from accepting these briefs nor from following the procedure the United States Supreme Court outlined in *Anders*." *Sims* at ¶ 7-14 (discussing "the duties of appellate counsel when filing an *Anders* brief and our duties when ruling on counsel's motion to withdraw on the grounds that the appeal would be frivolous" even in the absence of former Loc.App.R. 16(C), different Ohio appellate courts' views on *Anders* briefs and this court's decision that "until the Ohio Supreme Court resolves the split among the

Ohio Appellate Districts regarding the application of *Anders* * * * we will continue to adhere to the procedures outlined in *Anders* pertaining to both counsel and the court when appointed appellate counsel files a motion to withdraw because an appeal would be wholly frivolous"); *see also State v. Lariche*, 8th Dist. Cuyahoga No. 108512, 2020-Ohio-804, ¶ 7.

**Independent Review**

{¶ 37} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 38} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort," *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694,

2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.*, 2013-Ohio-1704, at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

### Standard for Terminating Parental Rights and Granting Permanent Custody to CCDCFS

{¶ 39} Before a juvenile court can terminate parental rights and grant permanent custody of a child to CCDCFS, it must satisfy the two-prong test set forth in R.C. 2151.414. First, the juvenile court must find by clear and convincing evidence that one of the following conditions set forth in R.C. 2151.414(B)(1)(a) through (e) exists:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶ 40} Second, the juvenile court must find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1). "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 2015-Ohio-1028, at ¶ 8. A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "'if the record contains some competent, credible evidence from which the court could have found that the essential statutory

elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

### The Juvenile Court's Decision to Grant Permanent Custody of J.L. to CCDCFS

{¶ 41} With respect to the first prong, the agency moved for permanent custody pursuant to R.C. 2151.414(B)(1)(a). The record reflects that J.L. was removed from his Mother's home on June 28, 2018. R.C. 2151.414(E) states that "[i]n determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence." If the court determines, by clear and convincing evidence, that one or more specified circumstances exist as to each of the child's parents, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." R.C. 2151.414(E).

{¶ 42} Here, the juvenile court found, by clear and convincing evidence, that R.C. 2151.414(E)(1), (4) and (10) applied, supporting its determination that J.L. could not be placed with either parent within a reasonable time or should not be placed with his parents:

> One or more of the factors in division (E) of section 2151.414 of the Revised Code exist and the child cannot be placed with one of the child's parents within a reasonable period of time or should not be placed with either parent[.]

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be removed from the parents, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home.

The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

* * *

The parent has abandoned the child.

{¶ 43} With respect to the second prong, R.C. 2151.414(D)(1) states that in determining whether permanent custody is in a child's best interest, the court "shall consider all relevant factors," including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

**{¶ 44}** The best interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59. Although the juvenile court is required to consider each statutory factor in determining what is in a child's best interest under R.C. 2151.414(D)(1), no one factor is to be given greater weight than the others. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. A juvenile court has considerable discretion in weighing the factors set forth in R.C. 2151.414(D)(1). Only one of the factors needs to be resolved in favor of permanent custody to terminate parental rights. *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.* at ¶ 53. We review a juvenile court's determination of a child's best interest under R.C. 2151.414(D)(1) for abuse of discretion. *See, e.g., In re P.B.*, 8th Dist. Cuyahoga Nos. 109518 and 109519, 2020-Ohio-4471, ¶ 76, citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47.

**{¶ 45}** The record reflects that the juvenile court considered each of the relevant R.C. 2151.414(D)(1) factors in determining that an award of permanent custody was in J.L.'s best interest. The juvenile court explained its reasoning as follows:

> The Court finds that the child's continued residence in or return to the home of [J.A.] and [J.L., Sr.] will be contrary to the child's best interest.
>
> The Court further finds that reasonable efforts were made to prevent the removal of the child from his home, or to return the child to the home, and to finalize the permanency plan, to wit: reunification. Relevant services provided to the family were attempts to have mother successfully complete a substance abuse program[,] mental health counseling, provide a stable home, meet J.L.'s (DOB 12/5/06) basic

needs and address J.L.'s (DOB 12/5/06) extensive medical and mental health issues. The latter was not successful because mother failed to complete all of the recommendations from her substance abuse assessment. Mother did complete intensive outpatient treatment, but failed to benefit from said treatment when she declined to follow [the] recommended after care program. Additionally, mother failed to benefit from treatment when she failed to submit [to a] random urinalysis request after being released from prison. Mother also does not have a stable home that she either leases or owns. Mother also does not have a job or any verifiable income to demonstrate that she can provide for J.L.'s ([DOB]12/05/06) basic needs let alone her own.

* * *

The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child. The parent is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

Other relevant factors: The child has special needs that Mother has failed to demonstrate she could manage and accordingly provide J.L. (DOB 12/5/06) adequate care.

**{¶ 46}** The juvenile court's findings are supported by competent, credible, clear and convincing evidence in the record.

**{¶ 47}** J.L. requires a caregiver with specialized skills and training. He has multiple medical conditions for which consistent medical care from multiple specialists is required. He is nonverbal, has certain autistic-like behaviors and requires specialized education. He will likely never be able to use the bathroom on his own and needs help getting dressed. In addition, he takes medication for seizures and has serious vision and mobility issues.

**{¶ 48}** The record reflects that during most of the time J.L. has been in agency custody, Mother was in and out of jail. As of the time of the hearing, Mother

had made little progress on her case plan. Although Mother did complete an intensive inpatient drug program, she refused to participate in the recommended after care or to submit to a requested drug screen. During the periods in which Mother was out of jail, she did not stay in contact with the agency. She made no effort to obtain stable housing or employment or take other steps to meet J.L.'s basic needs much less acquire the skills she would need to address his special medical and educational needs. The record reflects that Mother had not visited or otherwise communicated with J.L. since he was removed from her custody in June 2018. Although J.L. was unable to visit Mother while she was in jail, and although Mother once requested a visit with J.L. after she was released from jail, she was back in jail before arrangements could be made for a visit.

{¶ 49} With respect to Mother's request that the juvenile court extend temporary custody rather than grant permanent custody, a temporary custody order issued pursuant to R.C. 2151.353(A) terminates after one year. R.C. 2151.353(G). At the end of that year, the juvenile court "may extend the temporary custody order of the child for a period of up to six months, if it determines at the hearing, by clear and convincing evidence, that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension." R.C. 2151.415(D)(1).

{¶ 50} As of the time of the hearing, Mother was back in jail. It was anticipated that she would remain incarcerated for another six months. There is

nothing in the record to support a reasonable belief that J.L. could be reunified with Mother within any reasonable time or that an extension of temporary custody was in the best interest of J.L.

{¶ 51} Following a thorough, independent examination of the record as required by *Anders*, we cannot say, based on the record before us, that the juvenile court abused its discretion in determining that an award of permanent custody of J.L. to CCDCFS was in his best interest or otherwise erred in granting permanent custody of J.L. to CCDCFS.

{¶ 52} Accordingly, we agree that there is no merit to an appeal and that this appeal is wholly frivolous. We grant counsel's motion to withdraw and dismiss this appeal.

{¶ 53} Appeal dismissed.

It is ordered that appellee recover from appellant costs herein taxed.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

EILEEN T. GALLAGHER, A.J., and
MARY EILEEN KILBANE, J., CONCUR