[Cite as *In re A.L.*, 2022-Ohio-4095.]

IN THE COURT OF APPEALS OF OHIO

TENEH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 21AP-633 |
| [A.L., | : | (C.P.C. No. 19JU-5398) |
| H.L., | : | (REGULAR CALENDAR) |
| Appellant]. | | |
| | : | |

D E C I S I O N

Rendered on November 17, 2022

**On brief:** *Campbell Law, LLC,* and *April F. Campbell*, for appellant.

**On brief:** *Robert J. McClaren,* and *Tyler Dunham*, for appellee Franklin County Children Services.

**On brief:** *David K. Greer*, Guardian ad Litem for A.L.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

LUPER SCHUSTER, P.J.

{¶ 1} Appellant, H.L. ("mother"), mother of A.L., appeals from a decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating her parental rights and placing A.L. in the permanent custody of appellee, Franklin County Children Services ("FCCS"). Appointed counsel for mother filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967). For the following reasons, we find no non-frivolous issues for review and we affirm. However, we also use this opportunity to determine that, going forward, we will no longer accept *Anders* briefs in cases involving the termination of parental rights and motions for permanent custody.

**I. Facts and Procedural History**

{¶ 2}   This case involves FCCS's request for permanent custody of A.L., born May 1, 2019.  FCCS obtained an emergency custody order and filed a complaint on May 3, 2019 alleging A.L. to be a neglected and dependent child.  Pursuant to the complaint, mother had been hospitalized over 100 times due to psychiatric issues including threatening suicidal and homicidal ideations, and she was at a psychiatric hospital when she went into labor. When A.L. was born, mother required a 24-hour sitter to monitor her interactions with A.L. due to safety concerns for both mother and A.L.  Additionally, mother had tested positive for cocaine during every one of her prenatal drug screens and she admitted to using marijuana throughout her pregnancy.  The complaint further stated mother had been linked with mental health treatment professionals, and the treatment processionals were unable to determine that A.L. would be safe in mother's care.

{¶ 3}   The trial court conducted an August 1, 2019 hearing at which mother did not contest the facts underlying the complaint.  In an August 6, 2019 judgment entry, the trial court adjudicated A.L. to be a neglected and dependent child and temporarily committed him to the custody of FCCS through a temporary order of custody.

{¶ 4}   Following the issuance of the temporary order of custody, FCCS initially placed A.L. in kinship care with a maternal aunt.  However, on September 8, 2019, the maternal aunt took A.L. to the hospital alleging A.L. fell off a bed.  Further medical examination indicated A.L. had suffered fractures of both of his femurs, 13 to 14 rib fractures in different stages of healing, two broken fingers, a skull fracture, brain injury, and injuries to his genitals.  An investigation identified four alleged perpetrators from the kinship care home, though the investigation was ongoing and charges had not been filed. Family members in the kinship care home provided inconsistent stories about how A.L. sustained the injuries.  After A.L. was hospitalized, FCCS placed the child in a non-relative foster home.

{¶ 5}   Due to the severity of A.L.'s injuries, A.L. was linked with treatment for urology, cardiology, physical, and occupational therapies.  A.L. did not pass an EKG test, and doctors detected a heart murmur and abnormalities.  Developmentally, the injuries rendered A.L. as starting over as a newborn.

{¶ 6}   On March 12, 2020, FCCS filed a motion for permanent court commitment ("PCC"), also known as permanent custody, of A.L.  In the PCC motion, FCCS alleged that A.L. cannot be placed with either parent in a reasonable period of time or should not be placed with either parent, the child is abandoned, and that permanent custody was in the best interest of the child.  Further, FCCS stated mother had not visited A.L. since July 2019 and had therefore willfully abandoned him, had failed to maintain stable housing or income, had failed to engage in substance abuse or mental health treatment, and that the identity of the father was unknown.  FCCS additionally stated that mother has significant mental health diagnoses and treatment needs, and that FCCS had not been able to make contact with mother to inquire about the identity of the biological father.  FCCS then filed an amended PCC motion on July 20, 2021 to additionally assert that A.L. had been in the custody of FCCS for 12 or more months of a consecutive 22-month period.

{¶ 7}   The permanent custody motion was set for a full hearing.  The trial court granted mother two continuances after mother failed to appear for the hearing, first on March 18, and again on May 26, 2021.  When the matter came for hearing again on August 17, 2021, mother again failed to appear for trial.  Counsel for mother requested another continuance, stating mother was scheduled to be released from her most recent hospitalization at Twin Valley Behavioral Health sometime that day.  The trial court granted a third continuance, this time setting the trial for two days later.

{¶ 8}   At the August 19, 2021 hearing, mother again failed to appear for trial.  Counsel again requested another continuance.  Counsel informed the court that mother had been released from Twin Valley Behavioral Health and that FCCS had arranged a taxi to bring mother to court, but mother refused to get in the car.  The trial court denied counsel's continuance request and proceeded to trial in mother's absence.  Counsel for mother represented mother throughout the trial, including making evidentiary objections, cross-examining witnesses, giving an opening statement opposing the motion for PCC, and reiterating the opening statement as a closing argument.

{¶ 9}   During the trial, Sara Hartley, an employee with the Franklin County Guardianship Service Board, testified her agency was appointed guardian of mother in February 2020 following a referral from Ohio State University's Harding Hospital.  Since her involvement with mother in February 2020, Hartley testified mother has had at least

ten mental health hospitalizations. Mother's most recent mental health hospitalization occurred in the days before the trial. Hartley stated her contact with mother has been very limited because mother would not provide her whereabouts to the agency, and the primary visits Hartley had with mother were when she was hospitalized. Mother's mental health diagnoses include severe schizoaffective bipolar disorder, moderate substance abuse with stimulant use disorder, and moderate cannabis use disorder. Hartley testified she does not believe mother has a bond with A.L., that mother never discusses A.L., and, based on her involvement in the matter, the agency recommends the PCC motion be granted.

{¶ 10} The caseworker for FCCS assigned to the case, Tina Watkins, testified A.L. is placed in a treatment foster home. Watkins testified she went over the case plan with mother about five times. The case plan objectives included that mother obtain stable housing and a legal source of income, be compliant with her mental health treatment, live substance-free, provide for A.L.'s basic needs, complete visitation with A.L., and meet monthly with the caseworker.

{¶ 11} Watkins testified mother has primarily lived with her mom and that mother has not lived independently since FCCS opened the case. Further, Watkins does not believe mother is capable of living independently because of her mental health issues. When mother is released from mental health hospitals, Watkins said mother typically stops taking her prescribed medications. Additionally, Watkins testified mother has not obtained a legal source of income and has never been employed during the pendency of the case. The mental health component of the case plan required mother to be compliant with her medication and complete counseling, both of which Watkins testified mother failed to do. Watkins described an incident when she visited mother at mother's mom's house and mother became verbally threatening toward Watkins when she inquired about mother's medications. Watkins testified mother has refused to sign releases for her mental health records.

{¶ 12} Watkins testified she has had difficulty visiting and locating mother as mother often does not attend their scheduled appointments. Mother's mental health is an ongoing concern for Watkins. Moreover, Watkins testified mother completed only one of the random drug screens that FCCS required and had not engaged with the substance abuse services required of her.

{¶ 13} During the pendency of FCCS's case, Watkins testified that mother has been in and out of jail for criminal offenses including theft and loitering. At the time of trial, mother had a pending criminal indictment and capias for multiple counts of theft.

{¶ 14} Watkins testified that FCCS arranged visits for mother with A.L. but mother only attended the first two visits when A.L. was an infant. After mother missed the next four scheduled visits, FCCS removed the visits from the schedule.

{¶ 15} Watkins also described the circumstances related to the removal of A.L. from the kinship care home. She testified that when A.L. went to the hospital on September 8, 2019, the examining doctor determined A.L. had suffered severe physical abuse. A.L.'s injuries included multiple rib fractures from different dates, broken bones in his hand with different dates of healing, a healing fracture in his right femur, a yanking fracture in his right tibia, a fracture in his left tibia, a sub-congenital hemorrhage behind his right eye, a fresh brain bleed in the back of his skull, and injuries to his genitals. Watkins testified that the agency investigated A.L.'s injuries and determined it could not definitively identify a specific perpetrator because the family was not cooperative in the investigation, and she further noted mother had access to A.L. in the kinship care home during the timeframe of the abuse. A.L. has ongoing medical needs as a result of the abuse and is engaged with multiple specialists for his care.

{¶ 16} In his current foster home, where he has been since he was removed from kinship care, Watkins said A.L. is thriving. The current foster parents have helped A.L. maintain his approximately 40 doctor's appointments each month, learned how to care for him with a feeding tube, and continue to help him recover. Watkins testified A.L. is "very well bonded" to his foster parents and to his foster siblings. (Aug. 19, 2021 Tr. at 46.) A.L. has special needs, including a diagnosis of cerebral palsy, and the foster home is a prospective adoptive home for him. Ultimately, Watkins testified it was her recommendation that the trial court grant the PCC motion.

{¶ 17} E.T., the current foster mother for A.L., testified that A.L. has been placed in her home for 23 months. E.T. described A.L.'s condition on his arrival including a full cast-harness of both his legs up to his chest, and a cast on his right hand. In the early months of A.L.'s placement, E.T. said A.L. needed to attend medical appointments 30 to 40 times per month. Initially, E.T. stated doctors told her it was not likely that A.L. would ever walk,

talk, sit up, or function cognitively and could potentially be in a vegetative-like state his entire life. With lots of therapy and medical care, however, E.T. testified A.L. has exceeded expectations and has recently learned to walk and repeat a few words. A.L. has a lifelong diagnosis of spastic diplegic cerebral palsy, and E.T. testified she plans to work with his school at every stage to help him adapt.

{¶ 18} E.T. stated she has two adopted children and described A.L. as bonded to his foster siblings and shows them affection. E.T. testified she hopes to be able to adopt A.L. if the motion for PCC is granted. Further, E.T. testified that if mother were able to stabilize, she would allow mother to have contact with A.L.

{¶ 19} The final witness at the trial was David Greer, the guardian ad litem for A.L. The guardian ad litem noted that mother had not appeared at any semi-annual review meetings and had not appeared at any court hearing for more than two years. The guardian ad litem observed one of mother's visits with A.L. when A.L. was two months old and stated that mother held A.L. for less than five minutes before handing the baby back because mother was hungry. In the guardian ad litem's opinion, mother and A.L. were not bonded at all. Additionally, the guardian ad litem has observed A.L. with his foster family. The guardian ad litem described A.L. as "very bonded" with his foster parents and with his foster siblings. (Aug. 19, 2021 Tr. at 74.) The guardian ad litem testified A.L. cannot understand the nature of the court proceedings. It was the guardian ad litem's recommendation that the trial court grant the PCC motion.

{¶ 20} At the conclusion of trial, the guardian ad litem for the mother, Keith Brewster, also recommended the court grant the motion for PCC, stating that due to mother's mental health issues, it would not be in mother's best interest to have custody of A.L.

{¶ 21} Following the hearing, the trial court issued a decision and judgment entry on November 1, 2021 granting the PCC motion, terminating mother's parental rights and placing A.L. in the permanent custody of FCCS. The trial court found A.L. cannot be placed with either parent within a reasonable time and that permanent custody was in the child's best interest. Mother timely appeals.

{¶ 22} Mother's appointed counsel filed a brief pursuant to *Anders* alleging that counsel found the appeal to be wholly frivolous. In an August 1, 2022 journal entry, this

court notified mother of her right to file a supplemental brief and granted counsel's motion to withdraw as counsel. Mother did not file a supplemental brief. Accordingly, this matter is before this court upon the *Anders* brief filed by mother's former appellate counsel and the response briefs filed by FCCS and the guardian ad litem for the child.

## II. Potential Assignment of Error

{¶ 23} In the *Anders* brief, counsel identified the following potential assignment of error:

> Clear and convincing evidence did not support granting permanent custody of A.L. to FCCS.

## III. Analysis

{¶ 24} As noted above, counsel for mother elected to file an *Anders* brief on mother's behalf. "In *Anders*, the United States Supreme Court held that if, after a conscientious examination of the record, appellate counsel concludes that a defendant's case is wholly frivolous, counsel should so advise the court and request permission to withdraw." *State v. Hudson*, 10th Dist. No. 18AP-924, 2019-Ohio-5136, ¶ 8, citing *Anders* at 744. Counsel making an *Anders* request must file a brief outlining anything in the record that arguably could support the client's appeal. *Id.*, citing *Anders* at 744. Further, counsel must: (1) provide a copy of the brief and request to withdraw to the client, and (2) provide the client sufficient time to raise any matters the client chooses. *Id.*, citing *Anders* at 744. *See also State v. A.H.*, 10th Dist. No. 16AP-487, 2017-Ohio-7680, ¶ 16.

{¶ 25} When an appellate court receives an *Anders* brief, it must conduct an examination of the proceedings to determine whether the case is wholly frivolous. *Hudson* at ¶ 9, citing *Anders* at 744. Further, where, as here, the party does not file a pro se brief in response to an *Anders* brief, the appellate court will examine the potential assignment of error and the entire record below to determine whether the appeal lacks merit. *A.H.* at ¶ 18, citing *State v. Cooper*, 10th Dist. No. 09AP-511, 2009-Ohio-6275. If, after full review of the proceedings below, the appellate court finds only frivolous issues on appeal, it may proceed to address the merits of the case without affording the appellant the assistance of counsel. *Hudson* at ¶ 9, citing *Anders* at 744. However, if the appellate court determines there are non-frivolous issues for appeal, the appellate court must afford appellant the assistance of counsel to address those issues. *Id.*, citing *Anders* at 744.

{¶ 26} In the potential assignment of error, counsel asserts clear and convincing evidence did not support the trial court's decision granting permanent custody to FCCS.

{¶ 27} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio recognizes the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). However, these rights are not absolute, and a parent's natural rights are subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8; *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 28} A trial court may grant permanent custody if it determines by clear and convincing evidence that, pursuant to R.C. 2151.414(B), " 'such relief is in the best interest of the child.' " *In re G.E.H.*, 10th Dist. No. 15AP-966, 2016-Ohio-3535, ¶ 52, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 9. On appeal, we will not reverse a trial court's decision in a permanent custody case unless it is against the manifest weight of the evidence. *In re I.R.*, 10th Dist. No. 04AP-1296, 2005-Ohio-6622, ¶ 4, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. Judgments in permanent custody proceedings are not against the manifest weight of the evidence "when all material elements are supported by competent, credible evidence." *G.E.H.* at ¶ 52, quoting *J.T.* at ¶ 8. "Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 14. "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *Id.*

{¶ 29} In deciding to award permanent custody, the trial court must take a two-step approach. *Id.* at ¶ 18. The court must first determine if any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* Here, there is no dispute that A.L. had been abandoned by mother and had been in the temporary custody of FCCS for more than 12 months of a consecutive 22-month period, satisfying R.C. 2151.414(B)(1)(b) and (d). *See* R.C. 2151.011(C) ("a child shall be presumed abandoned when the parents of the child have failed to visit or maintain

contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days").

{¶ 30} Additionally here, the trial court made the alternative finding that the child cannot or should not be placed with the parents within a reasonable period of time. The trial court determined the statutory factors in R.C. 2151.414(E)(1), (2), (4), (10), (14), and (16) applied to mother and supported a finding that A.L. cannot and should not be placed with mother. The evidence at trial supported this finding, including that mother had not remedied the conditions that caused the child to be placed outside of the home, that mother suffers from chronic mental illness that is so severe that mother is unable to provide an adequate permanent home for the child, mother has demonstrated a lack of commitment toward the child, mother has abandoned the child, mother is unwilling to provide for the child, and that mother has significant mental health diagnoses and numerous psychiatric hospitalizations but would not cooperate with FCCS to provide information about her mental health treatment.

{¶ 31} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, it must then determine whether a grant of permanent custody is in the best interest of the child. *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1). In determining the best interest of a child, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in [R.C.

2151.413(D)(1)], the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not give any one factor "greater weight than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 32} The evidence at trial overwhelmingly supported the trial court's determination that granting permanent custody to FCCS was in A.L.'s best interest. Under R.C. 2151.414(D)(1)(a), in making its best interest determination, the trial court must consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child."

{¶ 33} Here, the evidence demonstrated there was no bond between mother and A.L., and that mother had only visited A.L. twice when A.L. was a few months old but since that time had stopped all visitations and has not seen A.L. in over two years. By contrast, A.L. is very bonded to his foster parents and foster siblings, having been in the continuous care of the same foster parents for 23 months at the time of trial. The foster mother testified her family loves A.L. and hopes to be able to adopt him, and she described the ways A.L. shows affection for his foster parents and foster siblings. The foster mother also described the specialized medical care A.L. requires and testified how she continues to help him achieve developmental milestones once thought unattainable after his physical abuse and cerebral palsy diagnosis. Additionally, both the FCCS caseworker and the guardian ad litem for the child testified that A.L. is very bonded to his foster family.

{¶ 34} R.C. 2151.414(D)(1)(b) requires the trial court to consider the wishes of the child, expressed either directly by the child or through the child's guardian ad litem. Here, the guardian ad litem testified A.L. is unable to express his wishes.

{¶ 35} R.C. 2151.414(D)(1)(c) requires the trial court to consider the custodial history of the child. A.L. has never lived with mother, and A.L. has been in the continuous

temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Additionally, he has been placed with the same foster family for the 23 months immediately preceding the trial following his removal from kinship care.

{¶ 36} R.C. 2151.414(D)(1)(d) addresses the child's need for legally secure placement and requires the trial court to consider whether this can be achieved without a grant of permanent custody to the agency. *In re D.P.*, 10th Dist. No. 06AP-780, 2007-Ohio-1703, ¶ 16. The evidence demonstrated A.L. was in need of a legally secure placement, especially given his ongoing medical needs, and that such placement could not be achieved without a grant of permanent custody to FCCS.

{¶ 37} R.C. 2151.414(D)(1)(e) asks whether any of the factors in R.C. 2151.414(E)(7) to (11) apply. The trial court found, and the evidence supports that finding, that mother had not visited or maintained any meaningful contact with A.L. for more than 90 days and had therefore abandoned the child. Mother's last visit with A.L. was in July 2019. Further, mother has demonstrated an unwillingness to protect and provide for the minor child.

{¶ 38} The trial court also noted additional factors supporting its consideration of the best interest of the child. Specifically, the trial court considered the recommendations of the FCCS caseworker and the guardian ad litem of the child that it would be in the best interest of A.L. to grant the permanent custody motion. Additionally, mother made no progress on her case plan, failed to maintain contact with FCCS, failed to engage with any services, and failed to make any efforts to establish or maintain a relationship with A.L. Mother also repeatedly failed to appear for the permanent custody hearing and offered no explanation for failing to appear.

{¶ 39} Based on all the testimony and evidence presented, including the entire case file, the trial court determined permanent custody is in the best interest of A.L. Having reviewed the entire record, we conclude the trial court had clear and convincing evidence to conclude permanent custody was in the best interest of the child. Furthermore, we find nothing in the record to indicate that an argument about the manifest weight of the evidence is anything other than wholly frivolous.

{¶ 40} Following our review of mother's potential assignment of error asserted in the *Anders* brief and our independent review of the record, we find the potential

assignment of error lacks merit. Additionally, we are unable to find any non-frivolous issues for appeal having arguable merit.

## IV. Further Use of *Anders* Briefs in Permanent Custody Cases

{¶ 41} This court has never considered the question of whether to allow *Anders* briefs in permanent custody cases. Having considered the approaches of the other appellate districts in Ohio, we note that some courts permit the filing of *Anders* briefs in these cases. *See In re Co.J.*, 3d Dist. No. 5-19-15, 2020-Ohio-538 (accepting counsel's *Anders* brief and determining the appeal is wholly frivolous); *In re D.M.*, 4th Dist. No. 15CA22, 2016-Ohio-1450, ¶ 8 ("[a]lthough *Anders* arose in a criminal context, we have previously determined that its procedures are appropriate in appeals involving the termination of parental rights"); *In re K.B.*, 7th Dist. No. 09 BE 24, 2010-Ohio-1015, ¶ 1 (although permanent custody is a civil matter and not a criminal matter, the *Anders* procedure nonetheless applies to appointed counsel in parental rights cases); *In re J.L.*, 8th Dist. No. 109626, 2020-Ohio-5254, ¶ 35 ("[a]lthough *Anders* arose in a criminal context, this court has applied *Anders* in appeals involving the termination of parental rights"); *In re J.B.*, 9th Dist. No. 29443, 2020-Ohio-2917, ¶ 3 (accepting the *Anders* brief filed by the father's counsel and reviewing the matter under the *Anders* procedure); *In re R.F.*, 12th Dist. No. CA2021-06-052, 2021-Ohio-4118, ¶ 36-37 (accepting the *Anders* brief filed by the father's counsel and dismissing the appeal as wholly frivolous). Other appellate districts, however, have recently considered this very question and determined that, despite a history of allowing *Anders* briefs in these matters, going forward they will no longer accept *Anders* briefs in cases involving the termination of parental rights. *See In re J.M.*, 1st Dist. No. C-130643, 2013-Ohio-5896, ¶ 11 ("[a]lthough we have allowed such appeals in the past, we decide today that the *Anders* procedure is not appropriate in permanent-custody cases"); *In re N.C.*, 2d Dist. No. 28105, 2019-Ohio-567, ¶ 89 ("from this time forward, our district will no longer allow *Anders* briefs to be filed in cases involving termination of parental rights"); *In re K.M.*, 5th Dist. No. 2019 AP 08 0033, 2020-Ohio-350, ¶ 17 ("from this point forward, this [court] will no longer accept *Anders* briefs for filing in cases involving permanent custody or dispositions of legal custody"); *In re B.H.*, 6th Dist. No. L-17-1126, 2018-Ohio-1238, ¶ 4 (following the First District's decision in *J.M.* and determining "this

court will no longer accept *Anders* briefs in legal custody or permanent custody cases"). The Eleventh District, like our district, has not considered the issue.

{¶ 42} Those districts that have specifically announced they will no longer accept *Anders* briefs have carefully set forth their reasoning. As the first district to announce its prohibition on *Anders* briefs in permanent custody cases, the First District Court of Appeals explained that "[a]lthough we have allowed such appeals in the past, we decide today that the *Anders* procedure is not appropriate in permanent-custody cases." *J.M.* at ¶ 11, 15 (noting "a parent's rights would be better protected where counsel is compelled to search the record and present arguments for review"). "The records in termination proceedings are typically extensive and highly fact-based. *Anders* review in a permanent-custody case places an inordinate burden on the appellate court to scour the voluminous record searching for error, a task that we are 'ill-equipped' to perform without the 'active and meaningful assistance of counsel.' " *J.M.* at ¶ 16, quoting *State v. Tsibouris*, 1st Dist. No. C-120414, 2013-Ohio-3324. Following the First District's reasoning, the Sixth District similarly announced it would no longer accept *Anders* briefs in cases involving the termination of parental rights, noting the change to be consistent both with the Sixth District's local rule limiting the filing of "no-error briefs" only to criminal appeals and is in the best interest of justice. *B.H.* at ¶ 3-4 (finding the First District's reasoning in *J.M.* applicable to legal custody determinations following a finding of abuse, dependency, or neglect, and to awards of permanent custody to a children's services agency).

{¶ 43} Though the Second District Court of Appeals did not have an analogous local rule limiting the filing of no-error briefs, it nonetheless determined it would follow the reasoning of both the First and Sixth Districts and no longer accept *Anders* briefs in permanent custody cases. *N.C.* at ¶ 86-88. The Second District specifically noted that while both R.C. 2151.352 and Juv.R. 4(A) provide a right to counsel for indigent parties involved in parental termination cases, "the fact that counsel is required does not equate to a right to use *Anders* procedures." *Id.* at ¶ 87 ("[p]arental termination cases are not criminal cases, and the same constitutional rights that motivated the *Anders* decision are not present"). Additionally, the Second District explained that "allowing *Anders* briefs can cause undue delay, contrary to the requirement to expedite cases involving termination of parental rights." *Id.* at ¶ 88. Most recently, the Fifth District followed the Second and Sixth Districts

and, while also not having an analogous local rule, determined it would no longer accept *Anders* briefs in permanent custody cases. *K.M.* at ¶ 17.

{¶ 44} We share the concerns of the First, Second, Fifth, and Sixth Districts that the heavily fact-dependent nature of permanent custody cases and the requirement of expedited resolution of these matters makes permanent custody cases particularly ill-suited to the *Anders* procedure on appeal. Thus, although we completed our task under *Anders* in this matter in the interests of judicial economy, the need for swift resolution of permanent custody matters, and the unique circumstances of this case, we follow the reasoning of the First, Second, Fifth, and Sixth Appellate Districts in determining that, from this point forward, we will no longer accept *Anders* briefs in cases involving permanent custody and termination of parental rights.

## V. Disposition

{¶ 45} Based on the foregoing reasons, we find no merit to the proposed assignment of error and overrule it. Having conducted our independent review under *Anders*, we are unable to find any non-frivolous issues for appeal related to the trial court's termination of mother's parental rights and the granting of permanent custody of A.L. to FCCS. Going forward, we will no longer accept *Anders* briefs in cases involving permanent custody and the termination of parental rights. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

DORRIAN and BEATTY BLUNT, JJ., concur.

————————————